## WARD *v.* RACE HORSE.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF WYOMING.

No. 841. Argued March 11, 12, 1896.—Decided May 25, 1896.

The provision in the treaty of February 24, 1869, with the Bannock Indians, whose reservation was within the limits of what is now the State of Wyoming, that "they shall have the right to hunt upon the unoccupied lands of the United States so long as game may be found thereon," etc., does not give them the right to exercise this privilege within the limits of that State in violation of its laws.

THIS appeal was taken from an order of the court below, rendered in a *habeas corpus* proceeding, discharging the ap-

pellee from custody. 70 Fed. Rep. 598. The petition for the writ based the right to the relief, which it prayed for and which the court below granted, on the ground that the detention complained of was in violation of the Constitution and laws of the United States, and in disregard of a right arising from and guaranteed by a treaty made by the United States with the Bannock Indians. Because of these grounds the jurisdiction below existed, and the right to review here obtains. Rev. Stat. § 753; act of March 3, 1891, 26 Stat. 826. The record shows the following material facts: The appellee, the plaintiff below, was a member of the Bannock tribe of Indians, retaining his tribal relation and residing with it in the Fort Hall Indian Reservation. This reservation was created by the United States in compliance with a treaty entered into between the United States and the Eastern band of Shoshonees and the Bannock tribe of Indians, which took effect February 24, 1869. 15 Stat. 673. Article 2 of this treaty, besides setting apart a reservation for the use of the Shoshonees, provided:

"It is agreed that whenever the Bannocks desire a reservation to be set apart for their use, or whenever the President of the United States shall deem it advisable for them to be put upon a reservation, he shall cause a suitable one to be selected for them in their present country, which shall embrace reasonable portions of the 'Port Neuf' and 'Kansas Prairie' countries."

In pursuance of the foregoing stipulation the Fort Hall Indian Reservation was set apart for the use of the Bannock tribe.

Article 4 of the treaty provided as follows:

"The Indians herein named agree, when the agency house and other buildings shall be constructed on their reservations named, they will make said reservations their permanent home, and they will make no permanent settlement elsewhere; but they shall have the right to hunt upon the unoccupied lands of the United States so long as game may be found thereon, and so long as peace subsists among the whites and Indians on the borders of the hunting districts."

In July, 1868, an act had been passed erecting a temporary

government for the Territory of Wyoming, 15 Stat. 178, c. 235, and in this act it was provided as follows:

"That nothing in this act shall be construed to impair the rights of person or property now pertaining to the Indians in said Territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians."

Wyoming was admitted into the Union on July 10, 1890. 26 Stat. 222, c. 664. Section 1 of that act provides as follows:

"That the State of Wyoming is hereby declared to be a State of the United States of America, and is hereby declared admitted into the Union on an equal footing with the original States in all respects whatever; and that the constitution which the people of Wyoming have formed for themselves be, and the same is hereby, accepted, ratified and confirmed."

The act contains no exception or reservation in favor of or for the benefit of Indians.

The legislature of Wyoming on July 20, 1895, (Laws of Wyoming, 1895, c. 98, p. 225,) passed an act regulating the killing of game within the State. In October, 1895, the district attorney of Uinta County, State of Wyoming, filed an information against the appellee (Race Horse) for having killed in that county seven elk in violation of the law of the State. He was taken into custody by the sheriff, and it was to obtain a release from imprisonment authorized by a commitment issued under these proceedings that the writ of *habeas corpus* was sued out. The following facts are unquestioned: 1st. That the elk were killed in Uinta County, Wyoming, at a point about one hundred miles from the Fort Hall Indian Reservation, which is situated in the State of Idaho; 2d, that the killing was in violation of the laws of the State of Wyoming; 3d, that the place where the killing took place was unoccupied public land of the United States, in the sense that the United States was the owner of the fee of the land; 4th, that the place where the elk were killed was in a mountainous region some distance removed from settlements, but was used by the settlers as a range for cattle, and was within election and school districts of the State of Wyoming.

*Mr. Benjamin F. Fowler* and *Mr. Willis Van Devanter* for appellant.

*Mr. Attorney General* for appellee.

MR. JUSTICE WHITE, after stating the case, delivered the opinion of the court.

It is wholly immaterial, for the purpose of the legal issue here presented, to consider whether the place where the elk were killed is in the vicinage of white settlements. It is also equally irrelevant to ascertain how far the land was used for a cattle range, since the sole question which the case presents is whether the treaty made by the United States with the Bannock Indians gave them the right to exercise the hunting privilege, therein referred to, within the limits of the State of Wyoming in violation of its laws. If it gave such right, the mere fact that the State had created school districts or election districts, and had provided for pasturage on the lands, could no more efficaciously operate to destroy the right of the Indian to hunt on the lands than could the passage of the game law. If, on the other hand, the terms of the treaty did not refer to lands within a State, which were subject to the legislative power of the State, then it is equally clear that, although the lands were not in school and election districts and were not near settlements, the right conferred on the Indians by the treaty would be of no avail to justify a violation of the state law.

The power of a State to control and regulate the taking of game cannot be questioned. *Geer* v. *Connecticut*, 161 U. S. 519. The text of article 4 of the treaty, relied on as giving the right to kill game within the State of Wyoming, in violation of its laws, is as follows:

"But they shall have the right to hunt on the unoccupied lands of the United States, so long as game may be found thereon, and so long as peace subsists among the whites and Indians on the borders of the hunting districts."

It may at once be conceded that the words "unoccupied

lands of the United States" if they stood alone, and were detached from the other provisions of the treaty on the same subject, would convey the meaning of lands owned by the United States, and the title to or occupancy of which had not been disposed of. But in interpreting these words in the treaty, they cannot be considered alone, but must be construed with reference to the context in which they are found. Adopting this elementary method, it becomes at once clear that the unoccupied lands contemplated were not all such lands of the United States wherever situated, but were only lands of that character embraced within what the treaty denominates as hunting districts. This view follows as a necessary result from the provision which says that the right to hunt on the unoccupied lands shall only be availed of as long as peace subsists on the borders of the hunting districts. Unless the districts thus referred to be taken as controlling the words "unoccupied lands," then the reference to the hunting districts would become wholly meaningless, and the cardinal rule of interpretation would be violated, which ordains that such construction be adopted as gives effect to all the language of the statute. Nor can this consequence be avoided by saying that the words "hunting districts" simply signified places where game was to be found, for this would read out of the treaty the provision as "to peace on the borders" of such districts, which clearly pointed to the fact that the territory referred to was one beyond the borders of the white settlements. The unoccupied lands referred to, being therefore contained within the hunting districts, by the ascertainment of the latter the former will be necessarily determined, as the less is contained in the greater. The elucidation of this issue will be made plain by an appreciation of the situation existing at the time of the adoption of the treaty, of the necessities which brought it into being and of the purposes intended to be by it accomplished.

When in 1868 the treaty was framed the progress of the white settlements westward had hardly, except in a very scattered way, reached the confines of the place selected for the Indian reservation. Whilst this was true, the march of advancing civilization foreshadowed the fact that the wilder-

ness, which lay on all sides of the point selected for the reservation, was destined to be occupied and settled by the white man, hence interfering with the hitherto untrammelled right of occupancy of the Indian. For this reason, to protect his rights and to preserve for him a home where his tribal relations might be enjoyed under the shelter of the authority of the United States, the reservation was created. Whilst confining him to the reservation, and in order to give him the privilege of hunting in the designated districts, so long as the necessities of civilization did not require otherwise, the provision in question was doubtless adopted, care being, however, taken to make the whole enjoyment in this regard dependent absolutely upon the will of Congress. To prevent this privilege from becoming dangerous to the peace of the new settlements as they advanced, the provision allowing the Indian to avail himself of it only whilst peace reigned on the borders was inserted. To suppose that the words of the treaty intended to give to the Indian the right to enter into already established States and seek out every portion of unoccupied government land and there exercise the right of hunting, in violation of the municipal law, would be to presume that the treaty was so drawn as to frustrate the very object it had in view. It would also render necessary the assumption that Congress, whilst preparing the way, by the treaty, for new settlements and new States, yet created a provision not only detrimental to their future well-being, but also irreconcilably in conflict with the powers of the States already existing. It is undoubted that the place in the State of Wyoming, where the game in question was killed, was at the time of the treaty, in 1868, embraced within the hunting districts therein referred to. But this fact does not justify the implication that the treaty authorized the continued enjoyment of the right of killing game therein, when the territory ceased to be a part of the hunting districts and came within the authority and jurisdiction of a State. The right to hunt given by the treaty clearly contemplated the disappearance of the conditions therein specified. Indeed, it made the right depend on whether the land in the hunting districts was unoccupied

public land of the United States. This, as we have said, left the whole question subject entirely to the will of the United States, since it provided, in effect, that the right to hunt should cease the moment the United States parted with the title to its land in the hunting districts. No restraint was imposed by the treaty on the power of the United States to sell, although such sale, under the settled policy of the government, was a result naturally to come from the advance of the white settlements in the hunting districts to which the treaty referred. And this view of the temporary and precarious nature of the right reserved, in the hunting districts, is manifest by the act of Congress creating the Yellowstone Park Reservation, for it was subsequently carved out of what constituted the hunting districts at the time of the adoption of the treaty, and is a clear indication of the sense of Congress on the subject. Act of March 1, 1872, c. 24, 17 Stat. 32; act of May 7, 1894, c. 72, 28 Stat. 73. The construction which would affix to the language of the treaty any other meaning than that which we have above indicated would necessarily imply that Congress had violated the faith of the government and defrauded the Indians by proceeding immediately to forbid hunting in a large portion of the Territory, where it is now asserted there was a contract right to kill game, created by the treaty in favor of the Indians.

The argument, now advanced, in favor of the continued existence of the right to hunt over the land mentioned in the treaty, after it had become subject to state authority, admits that the privilege would cease by the mere fact that the United States disposed of its title to any of the land, although such disposition, when made to an individual, would give him no authority over game, and yet that the privilege continued when the United States had called into being a sovereign State, a necessary incident of whose authority was the complete power to regulate the killing of game within its borders. This argument indicates at once the conflict between the right to hunt in the unoccupied lands, within the hunting districts, and the assertion of the power to continue the exercise of the privilege in question in the State of Wyoming in defiance

of its laws. That "a treaty may supersede a prior act of Congress, and an act of Congress supersede a prior treaty," is elementary. *Fong Yue Ting* v. *United States*, 149 U. S. 698; *The Cherokee Tobacco*, 11 Wall. 616. In the last case it was held that a law of Congress imposing a tax on tobacco, if in conflict with a prior treaty with the Cherokees, was paramount to the treaty. Of course the settled rule undoubtedly is that repeals by implication are not favored, and will not be held to exist if there be any other reasonable construction. *Cope* v. *Cope*, 137 U. S. 682, and authorities there cited. But in ascertaining whether both statutes can be maintained it is not to be considered that any possible theory, by which both can be enforced, must be adopted, but only that repeal by implication must be held not to have taken place if there be a reasonable construction, by which both laws can coexist consistently with the intention of Congress. *United States* v. *Sixty-seven Packages Dry Goods*, 17 How. 85; *District of Columbia* v. *Hutton*, 143 U. S. 18; *Frost* v. *Wenie*, 157 U. S. 46. The act which admitted Wyoming into the Union, as we have said, expressly declared that that State should have all the powers of the other States of the Union, and made no reservation whatever in favor of the Indians. These provisions alone considered would be in conflict with the treaty if it was so construed as to allow the Indians to seek out every unoccupied piece of government land and thereon disregard and violate the state law, passed in the undoubted exercise of its municipal authority. But the language of the act admitting Wyoming into the Union, which recognized her coequal rights, was merely declaratory of the general rule.

In *Pollard* v. *Hagan*, 3 How. 212, (1845,) the controversy was as to the validity of a patent from the United States to lands situate in Alabama, which at the date of the formation of that State were part of the shore of the Mobile River between high and low water mark. It was held that the shores of navigable waters and the soil under them were not granted by the Constitution to the United States, and hence the jurisdiction exercised thereover by the Federal government, before the formation of the new State, was held tem-

porarily and in trust for the new State to be thereafter created, and that such State when created, by virtue of its being, possessed the same rights and jurisdiction as had the original States. And, replying to an argument based upon the assumption that the United States had acquired the whole of Alabama from Spain, the court observed that the United States would then have held it subject to the Constitution and laws of its own government. The court declared, p. 229, that to refuse to concede to Alabama sovereignty and jurisdiction over all the territory within her limits would be to "deny that Alabama has been admitted into the Union on an equal footing with the original States." The same principles were applied in *Louisiana* v. *First Municipality,* 3 How. 589.

In *Withers* v. *Buckley,* 20 How. 84, (1857,) it was held that a statute of Mississippi creating commissioners for a river within the State, and prescribing their powers and duties, was within the legitimate and essential powers of the State. In answer to the contention that the statute conflicted with the act of Congress which authorized the people of Mississippi Territory to form a constitution, in that it was inconsistent with the provision in the act that "the navigable rivers and waters leading into the same shall be common highways, and forever free, as well to the inhabitants of the State of Mississippi as to other citizens of the United States," the court said (p. 92):

"In considering this act of Congress of March 1, 1817, it is unnecessary to institute any examination or criticism as to its legitimate meaning, or operation, or binding authority, farther than to affirm that it could have no effect to restrict the new State in any of its necessary attributes as an independent sovereign government, nor to inhibit or diminish its perfect equality with the other members of the confederacy with which it was to be associated. These conclusions follow from the very nature and objects of the confederacy, from the language of the constitution adopted by the States, and from the rule of interpretation pronounced by this court in the case of *Pollard's Lessee* v. *Hagan,* 3 How. 223."

A like ruling was made in *Escanaba Company* v. *Chicago*, 107 U. S. 678, (1882,) where provisions of the ordinance of 1787 were claimed to operate to deprive the State of Illinois of the power to authorize the construction of bridges over navigable rivers within the State. The court, through Mr. Justice Field, said (p. 683):

"But the States have full power to regulate within their limits matters of internal police, including in that general designation whatever will promote the peace, comfort, convenience and prosperity of their people."

And it was further added (p. 688):

"Whatever the limitation upon her powers as a government whilst in a territorial condition, whether from the ordinance of 1787 or the legislation of Congress, it ceased to have any operative force, except as voluntarily adopted by her, after she became a State of the Union. On her admission she at once became entitled to and possessed of all the rights of dominion and sovereignty which belonged to the original States. She was admitted, and could be admitted, only on the same footing with them. . . . Equality of the constitutional right and power is the condition of all the States of the Union, old and new."

In *Cardwell* v. *American Bridge Company*, 113 U. S. 205, (1884,) *Escanaba Company* v. *Chicago, supra,* was followed, and it was held that a clause in the act admitting California into the Union, which provided that the navigable waters within the State shall be free to citizens of the United States, in no way impaired the power which the State could exercise over the subject if the clause in question had no existence. Mr. Justice Field concluded the opinion of the court as follows (p. 212):

"The act admitting California declares that she is 'admitted into the Union on an equal footing with the original States *in all respects whatever.*' She was not, therefore, shorn by the clause as to navigable waters within her limits of any of the powers which the original States possessed over such waters within their limits."

A like conclusion was applied in the case of *Willamette Iron*

*Bridge Co.* v. *Hatch,* 125 U. S. 1, where the act admitting the State of Oregon into the Union was construed.

Determining, by the light of these principles, the question whether the provision of the treaty giving the right to hunt on unoccupied lands of the United States in the hunting districts is repealed, in so far as the lands in such districts are now embraced within the limits of the State of Wyoming, it becomes plain that the repeal results from the conflict between the treaty and the act admitting that State into the Union. The two facts, the privilege conferred and the act of admission, are irreconcilable in the sense that the two under no reasonable hypothesis can be construed as coexisting.

The power of all the States to regulate the killing of game within their borders will not be gainsaid, yet, if the treaty applies to the unoccupied land of the United States in the State of Wyoming, that State would be bereft of such power, since every isolated piece of land belonging to the United States as a private owner, so long as it continued to be unoccupied land, would be exempt in this regard from the authority of the State. Wyoming, then, will have been admitted into the Union, not as an equal member, but as one shorn of a legislative power vested in all the other States of the Union, a power resulting from the fact of statehood and incident to its plenary existence. Nor need we stop to consider the argument advanced at bar, that as the United States, under the authority delegated to it by the Constitution in relation to Indian tribes, has a right to deal with that subject, therefore it has the power to exempt from the operation of state game laws each particular piece of land, owned by it in private ownership within a State, for nothing in this case shows that this power has been exerted by Congress. The enabling act declares that the State of Wyoming is admitted on equal terms with the other States, and this declaration, which is simply an expression of the general rule, which presupposes that States, when admitted into the Union, are endowed with powers and attributes equal in scope to those enjoyed by the States already admitted, repels any presumption that in this particular case Congress intended to admit

the State of Wyoming with diminished governmental authority. The silence of the act admitting Wyoming into the Union, as to the reservation of rights in favor of the Indians, is given increased significance by the fact that Congress in creating the Territory expressly reserved such rights. Nor would this case be affected by conceding that Congress, during the existence of the Territory, had full authority in the exercise of its treaty making power to charge the Territory, or the land therein, with such contractual burdens as were deemed best, and that when they were imposed on a Territory it would be also within the power of Congress to continue them in the State, on its admission into the Union. Here the enabling act not only contains no expression of the intention of Congress to continue the burdens in question in the State, but, on the contrary, its intention not to do so is conveyed by the express terms of the act of admission. Indeed, it may be further, for the sake of the argument, conceded that where there are rights created by Congress, during the existence of a Territory, which are of such a nature as to imply their perpetuity, and the consequent purpose of Congress to continue them in the State, after its admission, such continuation will, as a matter of construction, be upheld, although the enabling act does not expressly so direct. Here the nature of the right created gives rise to no such implication of continuance, since, by its terms, it shows that the burden imposed on the Territory was essentially perishable and intended to be of a limited duration. Indeed, the whole argument of the defendant in error rests on the assumption that there was a perpetual right conveyed by the treaty, when in fact the privilege given was temporary and precarious. But the argument goes further than this, since it insists that, although by the treaty the hunting privilege was to cease whenever the United States parted merely with the title to any of its lands, yet that privilege was to continue although the United States parted with its entire authority over the capture and killing of game. Nor is there force in the suggestion that the cases of the *Kansas Indians*, 5 Wall. 737, and the *New York Indians*, 5 Wall. 761, are in conflict with these

views. The first case (that of the Kansas Indians) involved the right of the State to tax the land of Indians owned under patents issued to them in consequence of treaties made with their respective tribes. The court held that the power of the State to tax was expressly excluded by the enabling act. The second case (that of the New York Indians) involved the right of the State to tax land embraced in an Indian reservation, which existed prior to the adoption of the Constitution of the United States. Thus these two cases involved the authority of the State to exert its taxing power on lands embraced within an Indian reservation, that is to say, the authority of the State to extend its powers to lands not within the scope of its jurisdiction, whilst this case involves a question of whether where no reservation exists a State can be stripped by implication and deduction of an essential attribute of its governmental existence. Doubtless the rule that treaties should be so construed as to uphold the sanctity of the public faith ought not to be departed from. But that salutary rule should not be made an instrument for violating the public faith by distorting the words of a treaty, in order to imply that it conveyed rights wholly inconsistent with its language and in conflict with an act of Congress, and also destructive of the rights of one of the States. To refer to the limitation contained in the territorial act and disregard the terms of the enabling act would be to destroy and obliterate the express will of Congress.

For these reasons the judgment below was erroneous, and must, therefore, be

*Reversed, and the case must be remanded to the court below with directions to discharge the writ and remand the prisoner to the custody of the sheriff, and it is so ordered.*

Mr. JUSTICE BROWN dissenting.

As the opinion of the court seems to me to imply and to sanction a distinct repudiation by Congress of a treaty with the Bannock Indians, I am unable to give my assent to it. The facts are in a nutshell.

On July 3, 1868, the United States entered into a treaty, 15 Stat. 673, with the Shoshonees and Bannock tribes of Indians, by which the latter agreed to accept and settle upon certain reservations, and the former agreed that the Indians should have "the right to hunt on the unoccupied lands of the United States, so long as game may be found thereon, and so long as peace subsists among the whites and Indians on the borders of the hunting districts."

A few days thereafter, and on July 25, 1868, Congress passed an act "to provide a temporary government for the Territory of Wyoming," 15 Stat. 178, within which the Bannock reservation was situated, with a proviso "that nothing in this act shall be construed to impair the rights of person or property now pertaining to the Indians in said Territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians."

So far as it appears, the above treaty still remains in force, but the position of the majority of the court is that the admission of the Territory of Wyoming as a State abrogated it *pro tanto*, and put the power of the Indians to hunt on the unoccupied lands of the United States completely at the mercy of the state government.

Conceding at once that it is within the power of Congress to abrogate a treaty, or rather that the exercise of such power raises an issue, which the other party to the treaty is alone competent to deal with, it will be also conceded that the abrogation of a public treaty ought not to be inferred from doubtful language, but that the intention of Congress to repudiate its obligation ought clearly to appear. As we said in *Hauenstein* v. *Lynham*, 100 U. S. 483, "where a treaty admits of two constructions, one restricted as to the rights, that may be claimed under it, and the other liberal, the latter is to be preferred. Such is the settled rule of this court." See also *Chew Heong* v. *United States*, 112 U. S. 536, 549.

It appears from the first article that this treaty was entered into at the close of a war between the two contracting parties; that the Indians agreed to accept certain reservations of land, and the United States, on its part, "solemnly agreed" that no

persons, with certain designated exceptions, "shall ever be permitted to pass over, settle upon or reside in the territory described in this article for the use of said Indians, and . . . they shall have the right to hunt on the unoccupied lands of the United States so long as game may be found thereon, and so long as peace subsists between the whites and the Indians on the borders of the hunting districts." The fact that the Territory of Wyoming would ultimately be admitted as a State must have been anticipated by Congress, yet the right to hunt was assured to the Indians, not until this should take place, but so long as game may be found upon the lands, and so long as peace should subsist on the borders of the hunting districts. Not only this, but the Territory was created with the distinct reservation that the rights of the Indians should not be construed to be impaired so long as they remained unextinguished by further treaty. The right to hunt was not one secured to them for sporting purposes, but as a means of subsistence. It is a fact so well known that we may take judicial notice of it, that the Indians have never been an industrial people; that even their agriculture was of the rudest description, and that their chief reliance for food has been upon the chase. The right to hunt on the unoccupied lands of the United States was a matter of supreme importance to them, and as a result of being deprived of it they can hardly escape becoming a burden upon the public. It is now proposed to take it away from them, not because they have violated the treaty, but because the State of Wyoming desires to preserve its game. Not doubting for a moment that the preservation of game is a matter of great importance, I regard the preservation of the public faith, even to the helpless Indian, as a matter of much greater importance. If the position of the court be sound, this treaty might have been abrogated the next day by the admission of Wyoming as a State, and what might have been done in this case might be done in the case of every Indian tribe within our boundaries. There is no limit to the right of the State, which may in its discretion prohibit the killing of all game, and thus practically deprive the Indians of their principal means of subsistence.

I am not impressed with the theory that the act admitting Wyoming into the Union upon an equal footing with the original States authorized them to impair or abrogate rights previously granted by the sovereign power by treaty, or to discharge itself of burdens which the United States had assumed before her admission into the Union. In the cases of the *Kansas Indians,* 5 Wall. 737, we held that a State, when admitted into the Union, was bound to respect an exemption from taxation which had been previously granted to tribes of Indians within its borders, because, as the court said, the State of Kansas "accepted this status when she accepted the act admitting her into the Union. Conferring rights and privileges on these Indians cannot affect their situation, which can only be changed by treaty stipulation, or a voluntary abandonment of their tribal organization. As long as the United States recognizes their national character they are under the protection of the treaties and laws of Congress, and their property is withdrawn from the operation of state laws."

It is true that the act admitting the State of Kansas into the Union contained a proviso similar to that in the act erecting a government for the Territory of Wyoming, viz.: "That nothing contained in this said constitution respecting the boundaries of said State shall be construed to impair the rights of person or property now pertaining to the Indians of said Territory, so long as such rights shall remain unextinguished by treaty with such Indians." In this particular the cases differ from each other only in the fact that the proviso in the one case is inserted in the act creating the Territory, and in the other in the act admitting the Territory as a State; and unless we are to say that the act admitting the Territory of Wyoming as a State absolved it from its liabilities as a Territory, it would seem that the treaty applied as much in the one case as in the other. But however this may be, the proviso in the territorial act exhibited a clear intention on the part of Congress to continue in force the stipulation of the treaty, and there is nothing in the act admitting the Territory as a State which manifests an intention to repu-

diate them. I think, therefore, the rights of these Indians could only be extinguished by purchase, or by a new arrangement with the United States.

I understand the words "unoccupied lands of the United States" to refer not only to lands which have not been patented, but also to those which have not been settled upon, fenced or otherwise appropriated to private ownership, but I am quite unable to see how the admission of a Territory into the Union changes their character from that of unoccupied to that of occupied lands.

MR. JUSTICE BREWER, not having heard the argument, takes no part in this decision.