STATE, Respondent, v. GURNOE and others, Appellants. [Case No. State 92.] *
STATE, Respondent, v. CONNORS and others, Appellants. [Case No. State 95.] *

*Nos. State 92, 95. Argued December 1, 1971.—Decided January 6, 1972.*
(Also reported in 192 N. W. 2d 892.)

* Motion for rehearing denied, without costs, on March 2, 1972.

394

For the appellants there was a brief by *Joseph F. Preloznik* and *Charles W. Wheeler*, both of Madison, and oral argument by *Mr. Wheeler*.

For the respondent the cause was argued by *Priscilla MacDougall*, assistant attorney general, with whom on the brief was *Robert W. Warren*, attorney general.

WILKIE, J. A brief history of the Lake Superior Chippewa is necessary to our consideration of the important issues presented by these cases.[1]

[1] History taken from *1850 Report of the Commissioner of Indian Affairs*, 51–54.

*History of the Lake Superior Chippewa.*

The Chippewa originally lived on the northeast coast of the United States. They were gradually driven westward by the powerful Iroquois and Six Nations tribes of New York and Canada. The tribe settled in the northern part of what is now the state of Wisconsin, on the Apostle Islands. While living on the islands the tribe subsisted by fishing and agriculture. As the Sioux moved further west from Wisconsin in the midseventeenth century the Chippewa gradually left the islands, settling around Lake Superior and the Mississippi, and dividing into several bands, of which the Lake Superior Chippewa is but one.

The Lake Superior band, also known as the *Ke-che-gum-me-win-in-e-wug*, or Great Lake men, settled in what now is northern Michigan, Wisconsin, and Minnesota. They lived primarily on the fish in Lake Superior. The report of the Commissioner of Indian Affairs in 1850 concludes:

"The Lake Shore Chippewas have an inexhaustible resource in the fish, which plentifully abounds in the waters of the lake. They are naturally well disposed towards the whites, docile and harmless." [2]

By the treaties of St. Peters [3] in 1837, and La Pointe [4] in 1842, the Indians ceded their Wisconsin lands to the United States government. In exchange, Article 5 of the 1837 treaty guaranteed the Chippewa hunting and fishing rights on ceded lands "during the pleasure of the President of the United States." The provisions of the 1842 treaty gave the Chippewa their hunting rights on ceded lands "until required to remove by the President of the United States."

---

[2] *Id.* at pages 53, 54.

[3] 7 *United States Statutes at Large* (Indian Treaties), p. 536, signed July 29, 1837, proclaimed June 15, 1838.

[4] 7 *United States Statutes at Large* (Indian Treaties), p. 591, signed October 4, 1842, proclaimed March 23, 1843.

On February 6, 1850, President Zachary Taylor invoked the power granted by the 1842 treaty and by executive order directed all of the Chippewa to remove themselves to unceded lands. Despite this order the Chippewa continued to reside in the northernmost part of the State of Wisconsin and to fish in Lake Superior.

Then, on February 27, 1854, in response to the presidential order of 1850, the Wisconsin legislature memorialized Congress as follows: [5]

"MEMORIAL *to the President and Congress of the United States, relative to the Chippewa Indians of Lake Superior.*
"To His Excellency the President of the United States, and to the Senate and House of Representatives in Congress assembled:
"*The Memorial of the Legislature of the State of Wisconsin respectfully represents:*
"That the inhabitants of the counties of La Pointe and Douglass have nearly unanimously signed a petition showing to your memorialists, that the Chippewa Indians in the region of Lake Superior are a peaceable, quiet, and inoffensive people, rapidly improving in the arts and sciences: that they acquire their living by hunting, fishing, manufacturing maple sugar, and agricultural pursuits: that many of them have intermarried with the white inhabitants, and are becoming generally anxious to become educated and adopt the habits of the 'white man.'

"Your memorialists would therefore pray His Excellency, the President of the United States, to rescind the orders heretofore given for the removal of said Indians, and that such orders may be given in the premises, as shall secure the payment to said Indians, of their annuities at La Pointe, in La Pointe county on Lake Superior, that being the most feasible point therefor.

"And your memorialists also pray that the Senate and House of Representatives in Congress assembled will pass such laws as may be requisite to carry into effect such design and orders; and to encourage the permanent settlement of those Indians as shall adopt the habits of the citizens of the United States.

[5] Laws of 1854, *Memorial No. 8*, pp. 156, 157.

"And your memorialists firmly believing that justice and humanity require that such action should be had in the premises, will ever pray, etc.

"Approved, February 27, 1854."

On September 30, 1854, President Franklin Pierce signed the treaty under which appellants presently claim their rights.[6] Article 2 of this treaty established reservations for the La Pointe (Bad River) band and Ontonagon (Red Cliff) band. The 1854 treaty represents a fundamental change in federal policy toward the Chippewa inasmuch as it sanctioned their remaining in Wisconsin instead of removal to the unceded lands.

### *Issues.*

Several issues must be considered on this appeal:

1. Does state law or federal treaty govern whether the Indians are granted fishing rights?

2. Does the 1854 treaty between the United States and the Lake Superior Chippewa grant any fishing rights?

3. Did the presidential order of 1850 revoke the Indians' fishing rights so that they could not be granted in the 1854 treaty?

4. If there are any fishing rights, do such rights include the right to fish Lake Superior?

5. If there are any fishing rights granted by the treaty, what is the state's power to regulate fishing activities by the Indians?

### *Provisions of the treaty govern.*

Prior to 1953 the states had no jurisdiction over crimes occurring on Indian lands. In that year Congress enacted Public Law 280, codified as 18 U. S. C., sec. 1162, entitled "State Jurisdiction over offenses committed by or against Indians in the Indian country." This statute

---

[6] 10 *United States Statutes at Large,* p. 1109, signed and proclaimed September 30, 1854.

generally gives the state jurisdiction over crimes committed on Indian reservations. Par. (b) of this statute, however, provides:

"(b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof."

Therefore, it is clear that this statute does not affect any treaty rights.

Even before the statute, however, the Supreme Court of the United States made clear in *Missouri v. Holland* [7] that under the supremacy clause of the constitution, federal treaty law prevails over state law. Thus an interpretation of the 1854 treaty is required on these appeals.

### *Does the 1854 treaty grant fishing rights at all?*

Unlike the 1837 and 1842 treaties, the treaty of 1854 contains no express grant of hunting and fishing rights to the Bad River or Red Cliff bands except to give the Bad River band limited fishing rights near Madeline Island, an area not involved in the present appeals. Appellants rely on the following language in Article 2 of the treaty as the basis for their fishing rights:

"The United States agree to set apart and withhold from sale, *for the use of* the Chippewas of Lake Superior,

[7] (1920), 252 U. S. 416, 40 Sup. Ct. 382, 64 L. Ed. 641.

the following described tracts of land . . . ." (Emphasis added.)

The precise question is whether "for the use of" includes the fishing rights asserted by appellants. The circuit court found that the treaty did extend such rights. We agree.

In arguing that the treaty does not grant the Chippewa fishing rights, the attorney general advances several rules for the interpretation of treaties. The first, based upon *Guaranty Trust Co. v. United States*,[8] is that treaties should be construed so as not to override state laws. *Guaranty Trust* was dealing with quite a different situation than the present case, construing a treaty entered into between the United States and Russia. Contrary to the attorney general's assertion, this rule has not been applied to Indian treaties by the federal supreme court.[9] On the other hand, as will be noted below, the court has developed a set of rules specifically relating to Indian treaties. The supreme court has narrowly construed and limited the application of *Guaranty Trust*.[10] It would also seem logical that the effect of a treaty between the United States and Indians who have aboriginal ties to land presently making up the United States raises completely different problems than a treaty between the United States and a foreign sovereign which has no ties to the state, as was the case in *Guaranty Trust*. We conclude that in view of the limited construction given to *Guaranty Trust* by the United States Supreme Court and in view of the fur-

[8] (1938), 304 U. S. 126, 143, 58 Sup. Ct. 785, 82 L. Ed. 1224.

[9] While the Washington Supreme Court did apply the rules annunciated in non-Indian treaty cases to rights asserted under an Indian treaty in *State v. McCoy* (1963), 63 Wash. 2d 421, 387 Pac. 2d 942, it is apparent from a reading of that case that the court applied these rules only to determine the intent of the parties at the time the treaty was entered into.

[10] *E. g.*, *United States v. John Hancock Mut. Ins. Co.* (1960), 364 U. S. 301, 308, 81 Sup. Ct. 1, 5 L. Ed. 2d 1.

ther fact that it is not the rule applied in Indian treaty cases, it is not the rule to be followed in the present case.

A second rule advanced by the state for the interpretation of Indian treaties is that such treaties should not be construed by the court so as to meet alleged injustices, thus "rewriting" the terms of the treaty. This rule has been applied by the Supreme Court of the United States in cases in which the Indians were seeking money damages for the alleged forfeiture of tribal lands to the United States.[11] In such cases, results adverse to the Indians were reached only after an examination of the history and negotiations leading up to the treaty. This is consistent with a basic rule of treaty interpretation that a court will look "beyond its written words to the negotiations and diplomatic correspondence of the contracting parties relating to the subject matter, and to their own practical construction of it."[12] Thus the rule that treaties cannot be expanded beyond their terms is to be applied only after deciding what those terms are. It is notable, too, that this rule has been applied in cases in which the Indians are seeking damages from the federal government, but has not been invoked when considering the Indians' claim to hunting and fishing rights. In *Menominee Tribe v. United States*,[13] for example, the Supreme Court interpreted the language in another 1854 treaty "to be held as Indian lands are held" to include the right to hunt and fish regardless of Wisconsin law. This was the precise position taken by this court in *State v. Sanapaw*.[14]

---

[11] *Choctaw Nation v. United States* (1943), 318 U. S. 423, 63 Sup. Ct. 672, 87 L. Ed. 877; *Shoshone Indians v. United States* (1945), 324 U. S. 335, 65 Sup. Ct. 690, 89 L. Ed. 985.

[12] *Factor v. Laubenheimer* (1933), 290 U. S. 276, 294, 295, 54 Sup. Ct. 191, 78 L. Ed. 315.

[13] (1968), 391 U. S. 404, 406, 88 Sup. Ct. 1705, 20 L. Ed. 2d 697.

[14] (1963), 21 Wis. 2d 377, 124 N. W. 2d 41.

The attorney general finally argues that under the doctrine of express mention-implied exclusion, no fishing rights other than those expressly granted are extended by the 1854 treaty. It is argued that other Indian treaties, not involved in these cases, do give other tribes specific grants of hunting and fishing rights, while the 1854 treaty does not grant such rights (other than those directly associated with Madeline Island). It is further pointed out that in view of the express provision for fishing in an area near Madeline Island, no other fishing rights are to be implied. The circuit court carefully considered this argument and concluded that there was no consistent phraseology in Indian treaties covering hunting and fishing rights. As we have noted, treaties which do not specifically grant hunting and fishing rights have been interpreted to extend such rights by both this court [15] and the Supreme Court of the United States.[16] The proper rule as expressed long ago is to look to the intentions of the framers of the treaty: [17]

". . . The intention of the framers of the treaty, must be collected from a view of the whole instrument, and from the words made use of by them to express their intention, or from probable or rational conjectures. If the words express the meaning of the parties plainly, distinctly, and perfectly, there ought to be no other means of interpretation; but if the words are obscure, or ambiguous, or imperfect, recourse must be had to other means of interpretation, and in these three cases, we must collect the meaning from the words, or from probable or rational conjectures, or from both." (Original emphasis omitted.)

[15] *Id.*

[16] *Menominee Tribe v. United States, supra,* footnote 13; *Winters v. United States* (1908), 207 U. S. 564, 28 Sup. Ct. 207, 52 L. Ed. 340.

[17] *Ware v. Hylton* (1796), 3 U. S. (3 Dallas) 199, 239, 240, 1 L. Ed. 568.

Once the intention of the parties to the treaty has been ascertained, no rules of construction would authorize a different interpretation of the treaty.[18] Thus, here too it is necessary to ascertain the intent of the parties to the treaty.

Appellants argue that Indian treaties are to be liberally construed in favor of the Indians and that ambiguities or uncertainties are to be resolved in favor of the tribe's position. It is apparent from reading the cases cited by appellants [19] that this rule, too, is only to enable the court to determine what the intent of the parties was. The rule advanced by appellants is invoked only when it is of assistance in determining the intent of the parties in view of the history and negotiations between the federal government and the Indians.

We conclude that the basic rule for interpreting Indian treaties is to determine what was the intent of the parties. To determine that intent we must review the history of the tribe and the negotiations of the parties. To this end we are aided by a very recent (1971) opinion of the Michigan Supreme Court in *People v. Jondreau*,[20] a case interpreting this same treaty as it affects the Chippewa's right to fish on the Keweenaw Bay on Lake Superior. In *Jondreau* the court concluded: [21]

"The substance of the right to fish must have included the right to fish on the Keweenaw Bay. For the L'Anse band of Chippewa Indians, the fishing right on the Keweenaw Bay was clearly a valuable right. Any other construction of the treaty would make the right granted by the treaty without substance. The Indians did not

---

[18] *Society for the Propagation of the Gospel in Foreign Parts v. Town of New Haven* (1823), 21 U. S. (8 Wheat.) 464, 490, 5 L. Ed. 662.

[19] *Jones v. Meehan* (1899), 175 U. S. 1, 20 Sup. Ct. 1, 44 L. Ed. 49; *United States v. Winans* (1905), 198 U. S. 371, 25 Sup. Ct. 662, 49 L. Ed. 1089; *Winters v. United States, supra,* footnote 16.

[20] (1971), 384 Mich. 539, 185 N. W. 2d 375.

[21] *Id.* at 185 N. W. 2d 378.

have knowledge of the laws concerning municipal boundaries or sovereignty disputes between the Federal and State governments. Since they were living on land bordering the Keweenaw Bay, as 'an unlettered people' they would assume that the right to fish meant the right to fish on the Keweenaw Bay."

This is consistent with the interpretation given the treaty between the Menominee Indians and the United States. In *State v. Sanapaw* [22] this court said:

"It would seem unlikely that the Menominees would have knowingly relinquished their special fishing and hunting rights which they enjoyed on their own lands, and have accepted in exchange other lands with respect to which such rights did not extend. They undoubtedly believed that these rights were guaranteed to them when these other lands were ceded to them 'to be held as Indian lands are held.' Construing this ambiguous provision of the 1854 treaty favorably to the Menominees, we determine that they enjoyed the same exclusive hunting rights free from the restrictions of the state's game laws over the ceded lands, which comprised the Menominee Indian Reservation, as they had enjoyed over the lands ceded to the United States by the 1848 treaty."

The attorney general correctly points out that in *Jondreau* the Michigan Supreme Court was construing a portion of the 1854 treaty not involved in these appeals and that the history of the Menominee tribe is different from that of the Lake Superior Chippewa.

Nevertheless, one important consideration here is that the history of the Chippewa reveals an uninterrupted history of fishing on Lake Superior. They have occupied the land in what is now Bayfield and Ashland counties for more than 300 years. It is also clear that after the treaty was entered into the Indians continued their reliance upon Lake Superior. In his 1861 report, the Indian agent in Bayfield observed:

[22] *Supra*, footnote 14, at page 383.

"This reserve being located on the lake, where there is an abundance of fish the entire year, and being under the immediate supervision of the agent, the Indians who are located thereon are the most comfortable of any within this agency." [23]

As late as 1891, the Indian agent in Ashland, when discussing the activities of the members of the Red Cliff band, noted:

". . . The waters of the lake yield a bountiful supply of excellent fish and the surplus catch and all other surplus products find a ready market in the city of Bayfield. In capturing fish both gill nets and pound nets are employed. The natives own a small fleet of sailboats, and in navigating their little craft they display the confidence and skill of experienced sailors." [24]

In view of the more than 300 years of fishing the lake, and considering the activities of the bands after the treaty was enacted, we have no doubt but that it was the intention of the parties to the treaty for the Chippewa to retain fishing rights within the 1854 agreement. Anything that this court said in *State v. Johnson*,[25] the first case in which this court interpreted the 1854 Chippewa treaty, which is inconsistent with the interpretation here is overruled.

*The effect of the presidential order of 1850.*

The state argues that when President Taylor invoked the power given him under the 1837 and 1842 treaties to order the Chippewa removed from the ceded lands, this abrogated whatever fishing rights the Indians might have had. This assertion fails for several reasons. First, the provision in the 1854 treaty granting fishing rights

[23] *Report of the Commissioner of Indian Affairs,* 1861, p. 74.
[24] 1 *Report of the Commissioner of Indian Affairs,* 1891, p. 468.
[25] (1933), 212 Wis. 301, 249 N. W. 284.

and establishing reservations conflicts directly with the provisions of the earlier treaties providing for removal of the Chippewa to unceded lands from their land in Wisconsin. It is a standard rule of construction that when two statutes are manifestly in conflict the earlier statutes will be repealed by implication and the last one enacted will be controlling.[26] It seems reasonable that this rule should be applied to the present treaties, especially here when the treaty of 1854 represents a fundamental change in the government's policy toward the Lake Superior Chippewa. Prior to this treaty the policy was to remove the Indians to their unceded land; by this treaty the policy is reversed and directly states a policy of establishing reservations. Thus the policy of removal and the accompanying presidential power of removal were terminated by the 1854 treaty. The 1854 treaty governs the present relationship between the parties.

As a second, related proposition, the president's power to issue the executive order relied upon by respondent must stem either from an Act of Congress or from the constitution.[27] Here the authorization was extended by the 1837 and 1842 treaties, but was revoked by the 1854 treaty establishing the reservations and granting fishing rights on Lake Superior. Thus, in 1854 the Congress was free to allow the Chippewa to fish in Lake Superior without violating the executive order of 1850.

A third, and what is unquestionably a more basic response to the state's argument, is that the executive order does not revoke the fishing rights because it was never effective. This is not a situation in which the Indians stopped fishing in Lake Superior, moved from

---

[26] *Union Cemetery v. Milwaukee* (1961), 13 Wis. 2d 64, 71, 108 N. W. 2d 180; *Estate of Frederick* (1945), 247 Wis. 268, 271, 19 N. W. 2d 248.

[27] *Youngstown Co. v. Sawyer* (1952), 343 U. S. 579, 585, 72 Sup. Ct. 863, 96 L. Ed. 1153.

the area, and then returned under the protection of a new treaty. In the case of the Lake Superior Chippewa, they have been fishing in Lake Superior continually since the sixteenth or seventeenth century. While President Taylor ordered the Indians removed, the Chippewa continued to fish in Lake Superior and reside in the northernmost part of the state of Wisconsin. The Memorial passed by the Wisconsin legislature in 1854 recognizes the Chippewa as a people who acquired their living by hunting, fishing, and agriculture.[28] There is no indication that the executive order of 1850 had any effect whatsoever, except to motivate the people of Wisconsin to pass the Memorial referred to above.

In view of the fundamental change in policy marked by the 1854 treaty, the rights granted in that treaty, and the fact that the order of 1850 did not result in an actual revocation of fishing rights, we conclude that the 1850 executive order has no effect upon the rights granted by the 1854 treaty.

### Does the right to fish include the right to fish in Lake Superior?

The trial court determined that although the 1854 treaty did grant the Indians the right to fish, such right did not extend to the waters of Lake Superior. It ruled that such right did extend to the waters within the reservation. Since the alleged violations apparently occurred on Lake Superior, and not on the reservation, we are not concerned on these appeals with the extent of the appellants' fishing rights within the reservation.

In concluding that the fishing rights did not extend to the waters of Lake Superior, the trial court reasoned that since Wisconsin was admitted to the Union in 1848, in 1854 the federal government did not have the power to give the Chippewa fishing rights in Lake Superior

---

[28] *Supra*, footnote 5, at page 157.

because the lake was under the jurisdiction of the state. We disagree.

The enabling act which created the state of Wisconsin is an Act of Congress which can be superseded by a treaty.[29] Even though Wisconsin was created by 1848 legislation, Congress still had the power which it exercised in the 1854 treaty to convey fishing rights to the Chippewa.

In *Menominee Tribe v. United States*,[30] the same argument was made that the federal government could not extend to the Indians what the state of Wisconsin owned. The United States Supreme Court rejected this proposition:

"If any hiatus in title to the reservation lands in question occurred between 1848 and 1854, any jurisdiction that the State may have acquired over those would not have survived the Treaty of 1854. The Treaty of Wolf River was, under Article VI of the Constitution, the 'supreme law of the land,' and the exercise of rights on reservation lands guaranteed to the tribe by the Federal Government would not be subject to state regulation, at least in absence of a cession by Congress. Cf. *Ward v. Race Horse*, 163 U. S. 504, 514. In this connection it should be noted that in 1853 the Wisconsin Legislature consented to the establishment of the Menominee Reservation subsequently confirmed by the 1854 Treaty (1853 Wis. Jt. Res., c I), an action which can be fairly construed as a disclaimer of any jurisdiction the State may have possessed."

We find no valid distinction and none is asserted for holding that the Indians may fish in reservation waters but not on the waters of Lake Superior, their traditional fishing ground. On this issue the Michigan case of *Jondreau*[31] is directly in point. In that case it was pointed out that the Chippewa would never have con-

---

[29] *Ward v. Race Horse* (1896), 163 U. S. 504, 511, 16 Sup. Ct. 1076, 41 L. Ed. 244.

[30] *Supra*, footnote 13, at pages 412, 413, note 12.

[31] *Supra*, footnote 20.

sented to such a provision in their treaty because of the long ties between the tribe and Lake Superior. The court said that the Indians "would assume that the right to fish meant the right to fish [in Lake Superior]." [32]

In deciding whether the fishing rights granted by the treaty include fishing rights in Lake Superior, again the intent of the parties is important. The precise question of adjacent waters to an Indian reservation was reached by the United States Supreme Court in *Alaska Pacific Fisheries v. United States*.[33] In that case it was concluded that the fishing rights extended to the adjacent waters for the following reason:

". . . The Indians could not sustain themselves from the use of the upland alone. The use of the adjacent fishing grounds was equally essential. Without this the colony could not prosper in that location. The Indians naturally looked on the fishing grounds as part of the islands and proceeded on that theory in soliciting the reservation. They had done much for themselves and were striving to do more. Evidently Congress intended to conform its action to their situation and needs."

The same circumstances apply here. Whether the right to fish in Lake Superior is denominated "off-reservation rights" or interpreted to be inherent rights under the treaty, the result is the same—the Chippewa are entitled to the right to fish Lake Superior.

The Memorial of 1854 is also important because, as noted in the cited portion of the *Menominee* decision, such a memorial may be construed as a disclaimer by the state of jurisdiction over the lands or waters involved. There is nothing to suggest, as the attorney general argues, that this Memorial was intended to limit the Chippewa's rights to fish in Lake Superior.

We conclude, therefore, that the fishing rights granted by the 1854 treaty do extend to Lake Superior.

---

[32] *Jondreau*, footnote 20, *supra*, at page 378.
[33] (1918), 248 U. S. 78, 89, 39 Sup. Ct. 40, 63 L. Ed. 138.

*What power does the state possess to limit the exercise of fishing rights?*

Even though the 1854 treaty granted the Chippewa the right to continue fishing in Lake Superior, such a grant of rights does not foreclose the state from exercising police power to control fishing in Lake Superior even by Indians who claim fishing rights under that treaty. In *United States v. Winans* [34] and *Tulee v. Washington*,[35] the supreme court held that even when the Indians were fishing pursuant to certain treaty rights, the state could exercise its power to preserve fish and game within its jurisdiction. Although it is true that in *Winans* and *Tulee* the treaty right conferred to the Indians was common with the rights of other citizens of the state, in *Kake Village v. Egan*,[36] the court extended the *Tulee* rule to off-reservation fishing of Indians granted exclusive treaty rights. "Exclusive" means treaty rights accruing only to Indians. Appellants do not claim the right to fish Lake Superior "exclusive" of non-Indians. We conclude that on remand the state should be given the opportunity to prove that the regulations allegedly violated by appellants are "reasonable and necessary" for the preservation of fish in the state of Wisconsin.[37] The state must show that the regulations which it seeks to enforce against the Chippewa are reasonable and necessary to prevent a substantial depletion of the fish supply.

On remand the state should also have the opportunity to show that these regulations, as applied to appellants, are necessary in the exercise of other valid police powers.

[34] *Supra*, footnote 19, at page 383.

[35] (1942), 315 U. S. 681, 684, 62 Sup. Ct. 862, 86 L. Ed. 1115.

[36] (1962), 369 U. S. 60, 75, 82 Sup. Ct. 562, 7 L. Ed. 2d 573; see also: *Kennedy v. Becker* (1916), 241 U. S. 556, 562, 563, 36 Sup. Ct. 705, 60 L. Ed. 1166.

[37] *Puyallup Tribe v. Department of Game* (1968), 391 U. S. 392, 398, 399, 88 Sup. Ct. 1725, 20 L. Ed. 2d 689.

The circuit court suggested, for example, that the regulations relating to the marking and placement of gill nets might be required to protect boaters on Lake Superior. Under the rule of *Winans, Tulee, Kake* and *Puyallup,* such an interest would be valid.

A further consideration in determining whether the acts allegedly committed by appellants were protected by the 1854 treaty is whether the manner and location of fishing in the present cases is consistent with the type of fishing done by the Chippewa in 1854. Even if fishing rights are granted by treaty, those rights do not allow the Indians to fish however and wherever they like. As pertinent here, the treaty grants extend to the waters of Lake Superior as were used by the Chippewa at the time the treaty was agreed to, those waters being primarily adjacent to the Red Cliff and Bad River reservations. The methods of gathering such fish must also reasonably conform to the aboriginal methods and should not be extended to modern methods not intended by the 1854 treaty.

*By the Court.*—Orders reversed and causes remanded for further proceedings consistent with this opinion.

HALLOWS, C. J. (*concurring*). I concur with the majority opinion except for the take-back provisions on the exercise of the Indians' fishing rights. First, the majority opinion states to the Indians you have your historic and traditional fishing rights, but the state of Wisconsin "who did not grant you those rights in the first place" is going to regulate them. The regulation of the Indians' rights to fish could reduce them to the status of privileges of the white inhabitants of Wisconsin. I cannot agree that the needs of the white inhabitants of Wisconsin must determine the extent of the Indians' fishing rights. Nor can I agree that the methods of fishing by the Indians must be by aboriginal methods.

The Indians should be allowed a spinning rod as well as a bone hook or a spear.

The following memorandum was filed March 2, 1972.

PER CURIAM (*on motion for rehearing*). The final sentence of the opinion is modified to read as follows:
"Such fishing must also reasonably conform to those types and methods of gathering fish employed by the Chippewa at the time of the 1854 treaty or to such modern types and methods as are reasonably consistent with those used at the time of the treaty."

The motion for rehearing is denied without costs.