ANTHONY EARL, Secretary Department of Natural Resources
You have asked two questions which involve the interpretation and application of sec. 29.33, Stats. (the Wisconsin Limited Entry Commercial Fishing Program on Lake Superior), and Wisconsin Administrative Code chapter NR 25, which implements that statutory program. You note that the administrative rules limit the number of commercial fishing licenses on Lake Superior and that at times some Native Americans who hold a Wisconsin Commercial Fishing *Page 417 
License claim additional fishing rights guaranteed by treaty. Separate lake trout quotas are established and authorized for the licensed commercial fishers and Native Americans in Wisconsin Administrative Code section NR 25.06. You also indicate that 1977 Amendments to sec. 29.33, Stats., establish fishing boards that will be establishing criteria for re-licensing under the commercial fishing program and that resolution of the issues raised in your questions is needed to provide guidance to this body.
You first ask:
 May a fisher claim rights under both those preserved to Native Americans as well as to licensed commercial fishers, or must a party choose to operate under one of those authorities'?
It is my opinion that a state licensed fisher may claim certain rights under the state license even though that fisher also may be entitled to share in rights guaranteed to Indian tribes by treaty.
The focus of your inquiry is the relationship between the state and the Red Cliff and Bad River Bands of lake Superior Chippewa (hereinafter "The Bands") in regard to the fishery in the Apostle Islands area of Lake Superior. Your primary concern is the extent of the state's regulatory authority over the "harvest" of lake trout, including the allocation of harvestable lake trout between the "Indian" and "non-Indian" (i.e. state licensed) commercial fisheries in view of the Bands' treaty-protected fishing rights. ("Indian" or "Indian Fisher" will be used herein to mean Indian fishers fishing pursuant to treaty right.)
On January 6, 1972, the Wisconsin Supreme Court confirmed the Bands' fishing rights in the Lake Superior Fishery. State v.Gurnoe, 53 Wis.2d 390, 192 N.W.2d 892 (1972). the court held that Band members have the right to fish in Lake Superior pursuant to the Chippewa Treaty of September 30, 1854 (10 Stat. 1109), but that such rights are in common with all citizens and that the state can regulate the exercise of those rights provided such regulations are "reasonable and necessary to prevent a substantial depletion of the fish supply."
The 1854 Treaty created a somewhat unique relationship between the state and the Bands with respect to the lake Superior Fishery. To answer your questions, it is necessary to consider this relationship as *Page 418 
it has evolved since Gurnoe was decided. Although the Wisconsin courts have not considered the myriad of questions involved in defining this relationship, reference to decisions by other courts provides some guidance.
The United States Supreme Court has held that treaties with Indian tribes must be viewed as agreements between independent and sovereign nations that bargained (at least in theory) on the basis of formal equality. Washington v. Washington State, Etc.,99 S.Ct. 3055 (1979). See also McClanahan v. Arizona State TaxCommission, 411 U.S. 164 (1973).
In McClanahan the Court cautioned, however, that:
 [A Treaty] is not to be read as an ordinary contract
agreed upon by parties dealing at arms length with equal bargaining positions. . . . "[d]oubtful expressions are to be resolved in favor of [the Indian people]."
(Emphasis added.) 411 U.S. at 174. See State of Washington,99 S.Ct. at 3069.
Treaty fishing rights guaranteed as a result of such negotiations mean in effect that the Tribe is entitled to take a certain quantity of fish virtually free of state regulation and that such rights, whether exclusive or in common with non-Indians, are communal property rights belonging to the Tribe.State of Washington, 99 S.Ct. at 3071. See also, Whitefoot v.United States, 293 F.2d 658, 663, 155 Ct. Cl. 127 (1961), cert.denied, 369 U.S. 818 (1962). The fishing rights guaranteed by the 1854 Treaty in Lake Superior are off reservation communal rights of the Bands which an individual may be allowed to share by virtue of Band membership. The determination of who may share in these communal rights is an "internal affair" of the Band or Tribe involved subject to tribal regulation. United States v.State of Washington, 520 F.2d 676 (9th Cir. 1975); Settler v.Lameer, 507 F.2d 231 (9th Cir. 1974). See also, Williams v. Lee,358 U.S. 217, 221-222 (1959).
It is well established that by virtue of its residual sovereignty a state, as the representative of its people and for the common benefit of all its citizens, may control the fish and game within its borders and may regulate or prohibit such fishing and hunting, Manchester v. Massachusetts, 139 U.S. 240 (1891);Lawton v. Steele, 152 U.S. 133 *Page 419 
(1894); Geer v. Connecticut, 161 U.S. 519 (1896), subject, however, to the absence of conflicting federal legislation.Skiriotes v. Florida, 313 U.S. 69, 75 (1940). The state's regulatory authority extends to commercial fishing activity.LeClair v. Swift, 76 F. Supp. 729 (E.D. Wis. 1948). State regulatory authority, however, as defined in State v. Gurnoe, and similar cases, is extremely limited where the exercise of Indian treaty rights is involved. (See discussion infra.)
Under the Limited Entry Program, the Department of Natural Resources is authorized to limit the number of commercial licenses on Lake Superior, to designate areas where such licenses are operative, and to determine the qualification of commercial fishers. Sec. 29.33, Stats. Section 29.33 (1), Stats., provides in part that: "the department may adopt rules defining the qualifications of licensees in the reasonable exercise of this authority, giving due consideration to residency, past record, fishing and navigation ability and quantity and quality of equipment possessed."
The rules adopted to implement the Limited Entry Program provide that not more than twenty-one licenses authorizing commercial fishing in Lake Superior shall be issued and effective for each yearly licensing period. Wisconsin Administrative Code chapter NR 25.03. Eligibility requirements on a yearly basis for a period of five years are also established. Other provisions in the Code regulate commercial fishing activities by establishing an open season, size limits, quotas for the commercial harvest of lake trout and a permit program for various commercial fishing activities. Permits are required for the harvest of lake trout and for the use of certain commercial fishing gear. The Administrative Code does not establish quotas for the commercial harvest of fish other than lake trout.
The Limited Entry Commercial Fishing Program appears to be a reasonable exercise of the state's police power authority to manage its fish and game resources. The Department has broad discretion to define the qualifications of Limited Entry Licensees. The exercise of that authority, however, must be reasonable and consistent with constitutional requirements.
It is my opinion that the state cannot force residents who possess treaty fishing rights to forego those rights in return for a state commercial fishing license. Any state regulation affecting treaty fishing rights must satisfy the reasonable and necessary standard and not *Page 420 
simply the broader standard applied to state police power regulations. See Puyallup Tribe v. Washington Dept. of Game, (Puyallup I), 391 U.S. 392, 402, fn. 14 (1968). As already suggested, a tribe's treaty fishing rights may not be qualified by the state even though the manner of fishing, the size of the take, the restriction on commercial fishing activity and the like may be regulated by the state in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against Indian fishers. State v. Gurnoe; Puyallup I,391 U.S. at 398. The "appropriate standards" requirement means that the state must demonstrate that its regulations are reasonable and necessary conservation measures, State v. Gurnoe;Dept. of Game of Washington v. Puyallup Tribe (Puyallup II),414 U.S. 44 (1973); Tulee v. Washington, 315 U.S. 681, 684 (1942), and that the application of such regulations to Indian fishers is necessary in the interest of conservation. Antoine v. Washington,420 U.S. 194, 207 (1975). "Conservation" as used in this context means "insuring optimum spawning escapement for perpetuation of the run [species]." United States v. State of Washington,520 F.2d at 686. To require an Indian fisher to forego treaty rights in order to secure or hold a state commercial fishing license would render the treaty guarantees nugatory and therefore would constitute an impermissible interference with such federally protected rights. Further, the state may not force treaty Indians to yield their own protected interests in order to promote the welfare of the state's other citizens. See United States v. Stateof Washington, 520 F.2d at 686; Puyallup II.
As a citizen of the United States and the state, an Indian person is entitled to the same rights, privileges and equal opportunities enjoyed by non-Indian persons. Additionally, Tribe members may be entitled to certain treaty-protected rights not available to non-Indians. Accordingly, an Indian fisher is entitled to apply for and hold a state commercial fishing license under the limited entry program notwithstanding that individual's eligibility to share in treaty-protected fishing rights.
In your second question you ask:
 If a Native American may fish under both Native American fishing rights as well as under commercial fishing license rights, if he or she qualifies pursuant to section 29.33, Stats., does that individual have a right to fish under quotas established and *Page 421 
awarded under each separate classification or must the licensee choose to fish solely under one of those quota designations?
It is settled that the use of catch quotas for the harvest of fish and game resources is a reasonable exercise of the state's police power authority to manage its wildlife resources. Seee.g., Bittenhaus v. Johnston and another, 92 Wis. 588,66 N.W. 805 (1896); State v. Nergaard, 124 Wis. 414, 102 N.W. 899 (1905);Krenz v. Nichols, 197 Wis. 394, 222 N.W. 300 (1928). It is my opinion that a catch quota to prevent depletion of a particular species of fish can be applied to an Indian fishery under the state's limited authority to enforce conservation regulations against Indian fishers, provided such quota is necessary to prevent a substantial depletion of the fish supply. State v.Gurnoe; Puyallup I and II; Puyallup Tribe v. Washington Dept. ofGame (Puyallup III), 433 U.S. 165 (1977); Antoine v. Washington,420 U.S. 194 (1975).
Whether a catch quota is necessary to preserve a particular species such as the Lake Superior lake trout, and the size of such quota, are fact questions which may be in dispute. An Attorney General's opinion is not a proper vehicle to make a determination where there may be a dispute as to the facts. Any such dispute should be determined by a court, or by some other appropriate means such as an intergovernmental agreement between the state and the Bands. For purposes of this opinion, it is assumed that a total catch quota is necessary to preserve Lake Superior lake trout.
The Wisconsin Administrative Code provides for a total allowable annual commercial harvest of 100,000 pounds of lake trout. The Code per se does not establish quotas for the commercial harvest of any other species. As already noted, the establishment of a harvest quota is clearly a conservation measure. The Administrative Code, however, goes further and purports to divide the quota between Indian and non-Indian commercial fishers.
Pursuant to NR 25.06, each group is authorized to harvest forty percent of the total allowable annual harvest with the remaining twenty percent reserved for DNR use for special assessment purposes. I presume this allocation is based on the Department's interpretation of the 1854 Treaty and the decisions in State v.Gurnoe, and the Puyallup and other Washington cases which provide guidance where treaty fishing rights are involved. *Page 422 
Although our Supreme Court concluded in State v. Gurnoe that the Tribe's fishing rights were in common with all citizens, the Court did not decide what amount (i.e., total number, pounds or percent) of the harvestable surplus of fish belonged to the state and the Bands under the 1854 Treaty. The allocation of rights in common, however, has been considered in the Washington litigation. In Washington v. Washington State Etc., 99 S.Ct. 3055
at 3074-75, the Court concluded:
 We also agree with the Government that an equitable measure of the common right should initially divide the harvestable portion of each run that passes through a "usual and accustomed" place into approximately equal treaty and nontreaty shares, and should then reduce the treaty share if tribal needs may be satisfied by a lesser amount.
. . . .
 It bears repeating, however, that the 50% figure imposes a maximum but not a minimum allocation. As in Arizona v. California [373 U.S. 564] and its predecessor cases, the central principle here must be that Indian treaty rights to a natural resource that once was thoroughly and exclusively exploited by the Indians secures so much as, but not more than, is necessary to provide the Indians with a livelihood — that is to say, a moderate living. Accordingly, while the maximum possible allocation to the Indians is fixed at 50%, the minimum is not; the latter will, upon proper submissions to the District Court, be modified in response to changing circumstances.
(Footnote omitted.) The Court's approval of the approximate 50-50 allocation of the rights in common under the treaty included all harvestable surplus and not just the commercial take.99 S.Ct. at 3074-75.
There are many similarities between the treaty rights affecting the Lake Superior fishery and the treaty rights at issue in the Washington litigation. Accordingly, it may be judicious to follow the guidance offered by the Supreme Court respecting your apportionment efforts. Regardless of how determined, it may be in the best interest of the Bands to negotiate an equitable allocation or to acquiesce in the Department's determination. The state may secure the Bands' compliance with these quota allocations by gaining their acquiescence in *Page 423 
its goals or by judicial determination. Clearly some equitable apportionment of the available harvest between the state and the Bands must be effected in order to safeguard the Bands' federal Treaty rights.
Notwithstanding the problems inherent in effecting an apportionment, it is my opinion that the Department may establish individual catch quotas for all state licensed commercial fishers. The Department may exclude Indian fishers (who are eligible to share in the Bands' Treaty rights) from participation in the non-Indian share of the resource regardless of whether or not those individuals hold a state commercial fishing license. In other words, fish taken by Indian commercial fishers who hold a state license can be counted as part of the Bands' apportionment.Cf. State of Washington, 99 S.Ct. at 3075-76.
BCL:JN
 *Page 1