The CROW TRIBE OF INDIANS and Thomas L. Ten Bear, Plaintiffs,

v.

Chuck REPSIS, Individually, and Francis Petera, Individually, Defendants.

No. 92–CV–1002.

United States District Court, D. Wyoming.

Oct. 25, 1994.

Thomas E. Towe, Towe, Ball, Enright & Mackey, Billings, MT, Bruce P. Badley, Badley & Rasmussen, Sheridan, WY, Robert S. Pelcyger, Dale T. White, Fredericks, Pelcyger, Hester & White, Boulder, CO, for plaintiffs.

Ronald P. Arnold, Wyoming Atty. Gen., Cheyenne, WY, for defendants.

## DECISION GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DISMISSING CASE

ALAN B. JOHNSON, Chief Judge.

This matter is before the court on Cross Motions for Summary Judgment.

The Amended Complaint seeks a declaration that the Tribe and its members, such as Mr. Ten Bear, have an unrestricted right to hunt and fish on Big Horn National Forest lands within the state of Wyoming as reserved in the Fort Laramie Treaty of 1868. Plaintiffs seek declaratory judgment that plaintiffs retain their treaty-based off-reservation hunting and fishing rights on ceded, unoccupied and public lands, that defendants may neither interfere with the exercise of such rights, nor enforce Wyoming hunting and fishing laws against and regulations against plaintiffs. In addition, plaintiffs contend that the State of Wyoming and its agents erected a six mile long elk fence in violation of their treaty rights as well as in violation of 43 U.S.C. §§ 1061 through 1066, popularly known as the "Unlawful Inclosures of Public Lands Act" and seek injunctive relief barring defendants from maintaining the fence.

Having considered the Motions, the Reply, the memoranda, briefs, affidavits, and being fully advised upon its own review of the applicable statutes and authorities, the court will rule in favor of defendants Repsis and

Petera, who have been sued in their individual capacity.

## FACTUAL BACKGROUND

Plaintiff Thomas L. Ten Bear is an enrolled member of the Crow Tribe and a resident of Montana. On November 14, 1989, Mr. Ten Bear killed an elk in the Big Horn National Forest, Wyoming. This National Forest land was ceded by the Crow Tribe in the Fort Laramie Treaty of 1868. Mr. Ten Bear did not have a non-resident Wyoming hunting license when he killed the elk. He was apprehended by an agent of the Wyoming Game and Fish Department, defendant Chuck Repsis. Defendant Francis Petera is the Director of the Wyoming Game and Fish Department.[1]

Pursuant to Wyo.Stat. § 23-3-102(a), Mr. Ten Bear was charged with taking an elk on National Forest lands without having a Wyoming hunting license. On October 25, 1990, Mr. Ten Bear was found guilty in the County Court of Sheridan, Wyoming of illegally killing an elk. Mr. Ten Bear failed to appear at his sentencing hearing, and a criminal warrant for his arrest is now outstanding.

The Wyoming Department of Game and Fish maintains a fence near the Kerns Big Game Winter Range, approximately six to seven miles in length. The fence is capable of impeding the movement of elk.

The Crow Tribe is a party to two relevant treaties with the United States: The Treaty of Fort Laramie with Sioux, Etc., 1851 and the Treaty with the Crows, 1868. The latter treaty modifies certain provisions of the former treaty. No other Congressional enactment exists which has explicitly modified relevant portions of either treaty. In the Treaty with the Crows, 1868, at Article 4, this language appears:

"The Indians herein named agree, when the agency-house and other buildings shall be constructed on the reservation named,

1. Under a Memorandum of Understanding between the Wyoming Game and Fish Commission and the United States Forest Service, United States Department of Agriculture; Wyoming Game and Fish agreed to "exercise their primary responsibility for the enforcement of game and fish laws and Commission regulations on all Forest Service administered lands and waters in Wyoming." Master Memorandum of Understanding, ¶ 6(1) attached to affidavit of Jay Lawson (filed on November 16, 1992).

they will make said reservation their permanent home, and they will make no permanent settlement elsewhere, but *they shall have the right to hunt on the unoccupied lands of the United States so long as game may be found thereon, and as long as peace subsists among the whites and Indians on the borders of the hunting districts.*"

(emphasis added).

## CONCLUSIONS OF LAW

Plaintiffs seek declaratory judgment that they retain treaty-based off-reservation hunting and fishing rights on ceded, unoccupied and public lands, that defendants may neither interfere with the exercise of such rights, nor enforce Wyoming hunting and fishing laws and regulations against plaintiffs. Plaintiffs also seek to enjoin defendants from maintaining an elk fence in the vicinity of the Kerns Big Game Winter Range.

Defendants seek summary judgment dismissing the action because they contend: the 1896 case of *Ward v. Race Horse*[2] has already decided that plaintiffs' treaty rights have been abrogated; "game no longer existed; hunting would undermine conservation; federal lands are occupied; defendants are not violating the Unlawful Inclosure Act; and this court lacks subject matter jurisdiction."

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is any genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In this case, the material facts are not at issue and the parties agree that the case may be disposed of on the issues of law.

### Applicability of the Race Horse Case.

The question of whether Mr. Ten Bear and other members of the Crow Tribe of Indians retain their hunting rights pursuant to the Treaty with the Crows, 1868, may be resolved by answering the question of whether *Ward v. Race Horse* retains vitality.

In the last decade of the nineteenth century, a Bannock Indian named Race Horse[3] was apprehended while hunting on public lands of the United States, located in the state of Wyoming. Mr. Race Horse was apprehended and charged with violating the newly enacted game laws of the State of Wyoming.[4] In *Ward v. Race Horse*, 163 U.S. 504, 16 S.Ct. 1076, 41 L.Ed. 244 (1896), the United States Supreme Court reversed a Wyoming federal district court's grant of habeas corpus relief for Mr. Race Horse, and remanded him to the custody of the local sheriff.

The facts of the *Race Horse* case are not distinguishable from the present case. The identical treaty language preserving Indian hunting rights relied upon by plaintiffs in this case appears at Article 4 of the Treaty of July 3, 1868, 15 Stat. 673, to which the Bannock Indians were party.[5] The petitioner in the Race Horse case advanced the identical contention now made by plaintiffs: that they are not subject to any restrictions imposed by Wyoming's game laws because pursuant to treaty they possess the right to hunt on all unoccupied lands owned by the United States and located in the state of Wyoming.

*Race Horse* has two alternative holdings. One, the Court construes "unoccupied lands" as being "only lands of that character embraced within what the treaty denominates as hunting districts." *Id.* at 508, 16 S.Ct. at 1077. Thus, because it also held that Article 4's grant of the right to hunt was "temporary and precarious", that right ceased when the land ceased to be part of the hunting districts

---

2. 163 U.S. 504, 16 S.Ct. 1076, 41 L.Ed. 244.

3. The petitioner in that habeas corpus case is referred to only as "Race Horse." For purposes of this opinion, the court will refer to him as Mr. Race Horse.

4. Wyoming became a state on July 10, 1890. The game law was adopted on February 20,

1895, Mr. Race Horse was arrested for killing seven elk on July 1, 1895.

5. The Articles 4 of the two treaties are identical except that the Crow treaty refers to reservations in the singular and the Fort Bridger treaty at issue in Race Horse refers to reservations in the plural.

and came within the authority and jurisdiction of a newly-created state. *Id.* at 508–10, 16 S.Ct. at 1077–78. Two, *Race Horse* holds that under the Equal Footing Doctrine, the act admitting Wyoming into the United States abrogated the treaty-based hunting right, and therefore there was no such right, regardless of whether or not the lands were "occupied."

*Race Horse* is a much-criticized decision. *See e.g.* F. Cohen, Handbook of Federal Indian Law, (1982 ed.) Ch. 5, Sec. A4 at 268 n. 73 (*Race Horse* is "an anomaly, probably the only case where the Court has held an Indian treaty right extinguished based on doubtful and ambiguous expressions of Congressional intent"); *State v. Arthur,* 74 Idaho 251, 261 P.2d 135, 139 (1953) (finding the doctrine of *Race Horse* to be "repudiated" by subsequent United States Supreme Court cases); *Idaho v. Tinno,* 94 Idaho 759, 497 P.2d 1386, 1392 (1972) (declining to follow *Race Horse* ). Similarly, the Equal Footing doctrine has fallen into disfavor as a basis for limiting treaty-based hunting or fishing rights. *See e.g.* Cohen, *supra* at 268 n. 73 ("Application of the Equal Footing Doctrine to Indian cases has a rather tortured history."); *Sohappy v. Smith,* 302 F.Supp. 899, 912 (D.Ore. 1969) ("no merit" to contention that Yakima Indian Nation's treaty-based right to fish in Columbia River were "in some manner altered or affected by Oregon's admission to the Union on an 'equal footing' basis subsequent to the time the treaties" became effective.) Following *Race Horse,* only one United States Supreme Court opinion, also written by the author of *Race Horse,* Justice White, used the "Equal Footing" doctrine to make Indian treaty-based rights subject to state law. *See New York ex rel Kennedy v. Becker,* 241 U.S. 556, 36 S.Ct. 705, 60 L.Ed. 1166 (1916) (fishing rights in New York State).

The rationale of those courts that reject and decline to follow *Race Horse* is very ably laid out in *Idaho v. Tinno,* 94 Idaho 759, 497 P.2d 1386, 1392 (1972). The *Tinno* case arose in circumstances indistinguishable from either this case or the *Race Horse* case. In

*Tinno,* the Idaho Supreme Court considered an appeal by a member of the Shoshone–Bannock Tribe challenging the state of Idaho's right to enforce its state fishing regulations against him for fishing off-reservation in violation of those regulations. Mr. Tinno asserted that the same language from the same treaty that had been at issue in *Race Horse* granted him off-reservation fishing rights on unoccupied lands of the United States located in Idaho. 497 P.2d at 1389. The Idaho Supreme Court construed the treaty language granting to the members of the Shoshone–Bannock Tribe "the right to hunt on the unoccupied lands of the United States" to "include a fishing right." *Id.* at 1390. The Idaho Supreme Court then held that the treaty-based fishing right "certainly cannot be regulated by the state unless it clearly proves regulation of the treaty Indians' fishing in question to be necessary for preservation of the fishery." *Id.* at 1393. In reaching this holding, the Idaho Supreme Court refused to follow the seemingly controlling *Race Horse* case stating: "*Race Horse* and the theory it posited have been entirely discredited by the Supreme Court in [*United States v.*] *Winans*[6] and *Tulee* [*v. State Department of Game of Washington,*][7] and require no further discussion." *Id.* at 1392 n. 6.

Respectfully, this court must disagree with *Tinno* and other cases that hold *Race Horse* is no longer controlling law because *Race Horse* has not been reconsidered or over-ruled. Notwithstanding the *Tinno* court's interpretation, neither *Winans* or *Tulee* expressly overrule *Race Horse.* *Winans* involved the rights granted pursuant to treaty language dissimilar to the language at issue in *Race Horse* and in this case. That language secured to the members of the Yakima Indian Nation "the right of taking fish at all usual and accustomed places, in common with citizens of the territory." 198 U.S. at 378, 25 S.Ct. at 663. Further, the holding in *Winans* involves a grant of rights along the shore of navigable waters; namely, the Columbia River.

---

**6.** 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905).

**7.** 315 U.S. 681, 62 S.Ct. 862, 86 L.Ed. 1115 (1942).

The *Tulee* case further refined the holding of the *Winans* case by holding that the treaty-based right involved in *Winans* was superior to the State of Washington's right to charge a license fee for catching salmon with a net because such a fee would constitute "a charge for exercising the very right their ancestors intended to reserve." 315 U.S. at 685, 62 S.Ct. at 865. However, the Court also held that the treaty left "the state with power to impose on Indians, equally with others, such restriction of a purely regulatory nature concerning the time and manner of fishing outside the reservation as are necessary for the conservation of fish." 315 U.S. at 684, 62 S.Ct. at 864. In *Tulee,* the Supreme Court cites *Race Horse* as support for the statement that the State of Washington has "broad powers to conserve game and fish within its borders." 315 U.S. at 683, 62 S.Ct. at 864.

Thus, although many courts and commentators have questioned the continuing viability of the *Race Horse* decision, as noted above, the United States Supreme Court continues to cite the case.[8] *See Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 149, 93 S.Ct. 1267, 1270–71, 36 L.Ed.2d 114 (1972) ("*Race Horse* cited as example of Indians off-reservation being held "subject to nondiscriminatory state law otherwise applicable to all citizens of the State"); *Organized Village of Kake Village v. Egan,* 369 U.S. 60, 75, 82 S.Ct. 562, 570–71, 7 L.Ed.2d 573 (1961) (*Race Horse* cited in connection with statement: "Even where reserved by federal treaties, off-reservation hunting and fishing rights have been held subject to state regulation"); *Washington v. Confederated Tribes of Colville,* 447 U.S. 134, 179, 100 S.Ct. 2069, 2094–95, 65 L.Ed.2d 10 (1979) (per J. Rehnquist, concurring in part) (*Race Horse* cited in connection with statement: "No immunity for off-reservation activities had traditionally been recognized.")

Where the United States Supreme Court has already determined the legal issue before this court in *Race Horse,* where the underlying fact pattern, including the treaty language at issue, precisely matches that present in the instant case, and where *Race Horse* has not been expressly rejected or overruled, this court must follow the controlling decision. *Jaffree v. Board of School Commissioners of Mobile County,* 459 U.S. 1314, 1315–16, 103 S.Ct. 842, 842–43, 74 L.Ed.2d 924 (1983) (per Justice Powell as Circuit Justice) (federal district court must follow controlling U.S. Supreme Court decision even though it believed the ruling to be in error).

Thus, whether or not this court agrees that the reasoning or holding announced in *Race Horse* is correct, it remains controlling. Absent an express holding by the Tenth Circuit Court of Appeals or the United States Supreme Court that the case is no longer controlling, this court must follow *Race Horse.* Accordingly, the court will grant defendants' Motion for Summary Judgment dismissing plaintiffs' complaint for declaratory judgment that they have an unrestricted right to hunt and fish on Big Horn National Forest lands within the state of Wyoming as reserved in the Treaty with the Crows, 1868.

*Unlawful Inclosures Act*

■ Plaintiffs do not state a cause of action seeking to enjoin the remaining two individual defendants from maintaining the elk fence. The fence is owned and controlled by the State of Wyoming or Wyoming Game and Fish Commission.[9] *See* Affidavit in Support of Defendants' Motion for Summary Judgment (Arthur D. Reese, Jr.) Initially defendants in this case, the State of Wyoming and Wyoming Game and Fish were dismissed based on Eleventh Amendment immunity from suit.[10] Because it is not pos-

---

**8.** The citation of *Race Horse* in the Supreme Court's dicta in the case of *Menominee Tribe of Indians v. United States,* 391 U.S. 404, 411–12, n. 12, 88 S.Ct. 1705, 1710–11, n. 12, 20 L.Ed.2d 697 is ambiguous. In *Menominee* the treaty at issue was entered into *after* statehood and the "*c.f.*" citation to *Race Horse* was in connection with a statement about the exercise of treaty-based rights "on reservation land." *Id.*

**9.** The United States was involved in planning the fence and provided matching funds for its construction.

**10.** This court partially granted defendants' Motion to Dismiss and dismissed former defendants State of Wyoming, the Wyoming Game and Fish Commission, and the Wyoming Game and Fish Department on the grounds that their Eleventh Amendment state sovereign immunity had not

sible for the requested relief to be granted via the remaining defendants, the cause of action will be dismissed as to them.[11]

 Further, even if they did state a cause of action for which relief could be granted from these defendants, plaintiffs do not have standing to bring an action under the Unlawful Inclosures of Public Lands Act. According to section 1062 of the Unlawful Inclosures Act, "[i]t shall be the duty of the United States Attorney for the proper district, on affidavit filed with him by any citizen of the United States that section 1061 is being violated ... to institute a civil suit in the proper United States district court or territorial district court, *in the name of the United States....*" 43 U.S.C. § 1062 (emphasis added).

 That the Act does not provide for a private cause of action is supported by the fact that if the area of public lands allegedly inclosed by the fence is less than 160 acres, the authority of the Secretary of the Interior must be obtained prior to instituting any such action. 43 U.S.C. § 1066.

 Thus, the Unlawful Inclosures Act provides for federal enforcement, but also explicitly defines a role for private citizens in the process—filing an affidavit alerting the United States Attorney for this district of their allegation that the Act is being violated. Once a case is properly commenced by the United States, it is possible for an interested party, such as the Tribe, to obtain permission to intervene. See *e.g. United States ex rel. Bergen v. Lawrence*, 848 F.2d 1502, 1504 (10th Cir.Wyo.1988), *aff'g*, 620 F.Supp. 1414 (D.Wyo.1985) (Wildlife Federations joined as intervenors in Unlawful Inclosures Act case).

Plaintiffs did not comply with sections 1066 and 1062; instead they directly instituted this action for relief. Because this case was not brought in the name of the United States as provided in the Unlawful Inclosures Act, plaintiffs lack standing for their claim for

relief under the Act. Accordingly, the court must grant defendants' Motion for Summary Judgment and dismiss their suit for injunctive relief under the Act.

---

been waived or abrogated for injunctive or declaratory relief.

**11.** Plaintiffs added this cause of action by their Amended Complaint filed on August 5, 1992. Thus, contrary to plaintiffs' contention, the defendants' present motion for summary judgment

on the Unlawful Inclosures cause of action could not be a disguised attempt to obtain reconsideration of this court's June 11, 1992 Order denying the motion to dismiss defendants Petera and Repsis.