**CROW TRIBE OF INDIANS,**
Plaintiff–Appellant,

and

**Thomas L. Ten Bear, Plaintiff,**

v.

**Chuck REPSIS, individually; Francis Petera, individually, Defendants–Appellees,**

Shoshone–Bannock Tribes, Northern Arapahoe Tribe, Northern Cheyenne Tribe, the Oglala Sioux Tribe, Eastern Shoshone Tribe of the Wind River Reservation, State of Montana, State of Colorado, State of Idaho, State of South Dakota, State of Utah, Amici Curiae.

No. 94–8097.

United States Court of Appeals, Tenth Circuit.

Dec. 26, 1995.

Ronald P. Arnold, Senior Attorney General (William U. Hill, Attorney General, Mary B. Guthrie, Deputy Attorney General, Kristi T. Sansonetti, Special Assistant Attorney General, with him on the brief), Cheyenne, Wyoming, for defendants-appellees.

Dale T. White of Fredericks, Pelcyger, Hester & White, Boulder, Colorado (Bruce P. Badley of Badley & Rasmussen, P.C., Sheridan, Wyoming, with him on the brief), for appellant.

Jeanette Wolfley, Attorneys Office, Fort Hall, Idaho, on the brief for Amicus Curiae Shoshone–Bannock Tribes.

Joseph P. Mazurek, Attorney General, State of Montana (Clay R. Smith, Solicitor), Helena, Montana; Gale A. Norton, Attorney General, State of Colorado, Denver, Colorado; Alan G. Lance, Attorney General, State of Idaho, Boise, Idaho; Mark Barnett, Attorney General, State of South Dakota, Pierre, South Dakota; Jan Graham, Attorney General, State of Utah, Salt Lake City, Utah, on the brief for Amici Curiae States of Montana, Colorado, Idaho, South Dakota and Utah.

Marvin G. Amiotte, Pine Ridge, South Dakota, on the brief for Amicus Curiae Oglala Sioux Tribe; L. Robert Murray, Office of Tribal Attorneys, Wind River Reservation, Ft. Washakie, Wyoming, on the brief for Amicus Curiae Eastern Shoshone Tribe; Marc D. Slonim of Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, Washington, on the brief for Amicus Curiae Northern Cheyenne Tribe and Northern Arapaho Tribe.

Before KELLY and BARRETT, Circuit Judges, and O'CONNOR *, Senior District Judge.

BARRETT, Senior Circuit Judge.

The Crow Indian Tribe and Thomas L. Ten Bear (collectively referred to as "the Tribe") appeal the district court's order of October 25, 1994, *Crow Tribe of Indians v. Repsis,* 866 F.Supp. 520 (D.Wyo.1994), dismissing the Tribe's complaint for a declaratory judgment and injunctive relief based on alleged violations of its rights under the Treaty with the Crows, 1868, and the Unlawful Inclosures of Public Lands Act, 43 U.S.C. §§ 1061–1066.

### Facts

On November 14, 1989, Thomas L. Ten Bear, a Crow tribal member and resident of Montana, was cited by Chuck Repsis, a game warden employed by the Wyoming Fish and Game Department, for shooting and killing an elk on lands within the Big Horn National Forest without a Wyoming hunting license. Ten Bear was prosecuted and convicted of illegally killing an elk in violation of Wyo. Stat. § 23–3–102(a). As part of his unsuccessful defense, Ten Bear argued that he had an unrestricted right to hunt in the Big Horn National Forest as "unoccupied lands of the United States" under Article 4 of the Treaty with the Crows, 1868.

In the Treaty of Fort Laramie with Sioux, etc., 1851, 11 Stat. 749, approximately 38.5 million acres of land in the present day states of Montana and Wyoming were identified as Crow territory. This territory included what is now the Big Horn National Forest. In 1868, the Treaty of Fort Laramie with Sioux, etc., 1851, was modified by the Treaty with the Crows, 1868, wherein the Tribe ceded much of its territory, including the area of the Big Horn National Forest.

Both treaties dealt with the right of the Tribe and its members to hunt within aboriginal tribal lands and on ceded land. Article 4 of the Treaty with the Crows, 1868, provided that:

> The Indians herein named agree, when the agency house and other buildings shall be constructed on the reservation named, they will make said reservation their permanent home, and they will make no permanent settlement elsewhere, *but they shall have the right to hunt on the unoccupied lands of the United States so long as game may be found thereon, and as long as peace subsists among the whites and*

---

* The Honorable Earl E. O'Connor, Senior Judge, United States District Court for the District of Kansas, sitting by designation.

*Indians on the borders of the hunting districts.*

Treaty with the Crows, 1868, 15 Stat. 649, 650 (emphasis added).

The Tribe initiated this action on January 6, 1992, against the State of Wyoming, the Wyoming Department of Game and Fish, the Wyoming Game and Fish Commission, and individual defendants Chuck Repsis, Director of the Wyoming Department of Game and Fish, and Francis Petera, Director of the Wyoming Game and Fish Commission (collectively referred to as "the State"). The Tribe sought a declaration that the treaties entered into between the Tribe and the United States in 1851 and 1868 reserved to the Tribe and its members the unrestricted right to hunt and fish on all "unoccupied land of the United States" in Wyoming, which the Tribe ceded in 1868, including but not limited to national forest lands. The complaint was subsequently amended to include an additional count seeking the removal of a six-mile long "elk proof fence" constructed by the State along the southern border of the Crow Indian Reservation on the grounds that the fence violated the Unlawful Inclosures of Public Lands Act (UIA), 43 U.S.C. §§ 1061–1066, and the Tribe's treaty rights under the 1851 and 1868 treaties.

On February 4, 1992, the State filed a motion to dismiss the action based on the State's immunity from suit under the Eleventh Amendment. On June 11, 1992, the district court granted the State's motion to dismiss with respect to the State of Wyoming, the Department of Game and Fish, and the Game and Fish Commission on the grounds that the action against those defendants was barred under the Eleventh Amendment. However, the district court allowed the action to continue against the individual defendants.

On October 8, 1993, the district court heard oral argument on the State's and the Tribe's motions for summary judgment. On October 25, 1994, the district court entered its Decision Granting Defendants' Motion for Summary Judgment and Dismissing Case.

The district court found that the Tribe's off-reservation hunting right was foreclosed by *Ward v. Race Horse,* 163 U.S. 504, 16 S.Ct. 1076, 41 L.Ed. 244 (1896). *Crow Tribe,* 866 F.Supp. at 522–24. The district court also found that the Tribe had no standing to bring an action under the UIA and that, in any event, no relief could be granted because the Wyoming Game and Fish Commission, rather than the individual defendants, constructed, owned, and maintained the fence. *Id.* at 524–25.

*Issues*

On appeal, the Tribe contends that: (1) its unrestricted right to hunt and fish on off-reservation ceded lands under the Treaty with the Crows, 1868, was not foreclosed by *Ward v. Race Horse,* and (2) it has standing and may maintain an action against Francis Petera, Director of the Wyoming Game and Fish Commission, for violations of the UIA.[1]

The State contends that *Race Horse* controls; therefore, the Tribe's right to hunt which was reserved in the treaty was repealed by Wyoming's admission into the Union. In the alternative, the State contends that the Tribe has no right to hunt on the lands of the Big Horn National Forest because such lands are "occupied."

▮ We review the grant or denial of summary judgment *de novo,* applying the same legal standard used by the district court under Fed.R.Civ.P. 56(c). *Wolf v. Prudential Ins. Co. of Am.,* 50 F.3d 793, 796 (10th Cir.1995) (citation omitted). "Summary judgment is appropriate when there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law," *Russillo v. Scarborough,* 935 F.2d 1167, 1170 (10th Cir.1991), but "we must view the record in a light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991).

---

1. Although the Tribe discusses its right to "hunt and fish," there is nothing in the Treaty with the Crows, 1868, regarding fishing rights. There-fore, we restrict our discussion to the right to hunt as it was expressly delineated in the treaty.

*Discussion*

### I. Off–Reservation Hunting Right

The Tribe contends that the district court erroneously relied on *Race Horse*. The Tribe asserts that: (1) *Race Horse* is factually dissimilar to this case, and (2) the Supreme Court has overruled, repudiated and disclaimed each of the legal doctrines applied in *Race Horse*.

#### A.

The Tribe asserts that *Ward v. Race Horse* is factually dissimilar from this action and, therefore, not controlling. The Tribe argues that: (1) the Court in *Race Horse* was concerned with the Fort Bridger Treaty of 1869 involving the Shoshone and Bannock Indians whereas this case concerns the Treaty with the Crows, 1868, and (2) in *Race Horse*, the petitioner argued that he was completely immune from state game laws whereas here the Tribe acknowledges that its right is subject to state game laws provided the State can show the regulation is needed for essential conservation purposes.

#### 1.

In *Race Horse*, the Court considered whether the language of the Fort Bridger Treaty of February 24, 1869, between the United States and the Bannock Indians that "they shall have the right to hunt upon the unoccupied lands of the United States so long as game may be found thereon" gave the Indians an unrestricted right to hunt in violation of Wyoming's game laws. 163 U.S. at 504, 16 S.Ct. at 1076. In formulating the issue, the Court stated that:

> It is wholly immaterial, for the purpose of the legal issue here presented, to consider whether the place where the elk was killed is in the vicinage of white settlements. It is also equally irrelevant to ascertain how far the land was used for a cattle range, since the sole question which the case presents is whether the treaty

made by the United States with the Bannock Indians gave them the right to exercise the hunting privilege, therein referred to, within the limits of the State of Wyoming in violation of its laws. If it gave such right, the mere fact that the State had created school districts or election districts, and had provided for pasturage on the lands, could no more efficaciously operate to destroy the right of the Indian to hunt on the lands than could the passage of the game law. If, on the other hand, the terms of the treaty did not refer to lands within a State, which were subject to the legislative power of the State, then it is equally clear that, although the lands were not in school and election districts and were not near settlements, the right conferred on the Indians by the treaty would be of no avail to justify a violation of the state law.

*Id.* at 507, 16 S.Ct. at 1077.

The language that concerned the Court was in Article 4 of the treaty which provided that:

> The Indians herein named agree, when the agency house and other buildings shall be constructed on their reservations named, they will make said reservation their permanent home, and they will make no permanent settlement elsewhere; *but they shall have the right to hunt on the unoccupied lands of the United States so long as game may be found thereon, and so long as peace subsists among the whites and Indians on the borders of the hunting districts.*

*Id.* at 505, 16 S.Ct. at 1076 (emphasis added).

■ This is the same language found in Article 4 of the Treaty with the Crows, 1868. *See* Treaty with the Crows, 1868, Article 4, 15 Stat. at 650. Since the Court's focus was on the interpretation of the emphasized language, it is immaterial whether it appears in the Fort Bridger Treaty of 1869 or the Treaty with the Crows, 1868.[2]

---

**2.** This is consistent with the Court's decisions in *United States v. Winans,* 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905) (treaty of 1859 made with the Yakima Indians), and *Puyallup Tribe v. Department of Game of Wash.,* 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968) (*Puyallup I*)

(Treaty of Medicine Creek made with the Puyallup and Nisqually Indians in 1854). These cases involved the interpretation of identical provisions of two separate treaties with two separate Indian tribes providing "the right of taking fish at all usual and accustomed places, in common with

## 2.

On appeal, the Tribe recognizes its treaty hunting and fishing rights are subject to State regulation "in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians." *Puyallup Tribe v. Department of Game of Wash.*, 391 U.S. 392, 398, 88 S.Ct. 1725, 1728, 20 L.Ed.2d 689 (1968) (*Puyallup I*). However, recognizing this limitation on appeal does not distinguish its argument from that of the Bannock Indians in *Race Horse*. In its complaint, the Tribe argued that the treaties "reserve to [the Tribe and its members] *unrestricted* hunting . . . rights on all of the ceded lands . . ., including but not limited to the National Forest Lands." (J.A., Vol. I at 3 ¶ 7 & 151 ¶ 5) (emphasis added). This is indistinguishable from the argument of the Bannock Indians in *Race Horse*.

## B.

The Tribe contends that the Supreme Court has overruled, repudiated, and disclaimed each of the legal doctrines applied in *Race Horse*; therefore, *Race Horse* is not controlling. The Tribe asserts that the Supreme Court has: (1) overruled the doctrine of state plenary control over game; (2) overruled and repudiated the use of the equal-footing doctrine in treaty hunting rights cases; (3) subsequent to *Race Horse*, fashioned rules of treaty construction favoring Indian tribes that have replaced and repudiated those used in *Race Horse*; and (4) specifically reconciled state regulatory authority and Indian off-reservation hunting rights. Finally, the Tribe argues that (5) the State failed to show that conservation measures were required for Crow hunting under the treaty.

In order to address the Tribe's contentions, we must first examine *Race Horse* itself. As noted above, *Race Horse* decided whether the reserved "right to hunt on unoccupied lands of the United States so long as game may be found thereon, and as long as peace subsists among the whites and Indians on the borders of the hunting districts" reserved to the Indians an unrestricted right to hunt within Wyoming, even in violation of Wyoming's game laws. 163 U.S. at 505, 16 S.Ct. at 1076. The Court approached this issue by first defining the nature of the right reserved to the Indians in the treaty and then determining whether that right had survived Wyoming's admission into the Union.

To determine the nature of the reserved right, the Court examined the literary and historical context of the treaty and Article 4. Initially, the Court concluded that unoccupied lands "were only such lands of that character embraced within what the treaty denominates as hunting districts" and not all the lands ceded by the Indians which were owned by the United States and not yet settled. *Id.* at 508, 16 S.Ct. at 1077–78.

After careful historical analysis, the Court concluded that the hunting right reserved by the treaty "clearly contemplated the disappearance of the conditions therein specified" and was of a "temporary and precarious nature." *Id.* at 510, 16 S.Ct. at 1078. The Court noted that "[t]he construction that would affix to the language of the treaty any other meaning . . . would necessarily imply that Congress had violated the faith of the government and defrauded the Indians by proceeding immediately to forbid hunting in a large portion of the Territory" by the creation of Yellowstone Park Reservation in 1872 "for it was subsequently carved out of what constituted the hunting districts at the time of the adoption of the treaty." *Id.*

Once it established that the hunting right reserved by the treaty clearly contemplated the disappearance of the conditions specified in the treaty and was thus temporary, the Court addressed the conflict between the Indians' treaty right to hunt and the exercise of this right in violation of the laws of the newly created state of Wyoming. *Id.* at 510–11, 16 S.Ct. at 1078–79.

Wyoming was admitted into the Union on July 10, 1890. 26 Stat. 222, c. 664. Section 1 of the act of admission provides:

> That the State of Wyoming is hereby declared to be a State of the United States of America, and is hereby declared admitted

citizens of the Territory." *See Puyallup I*, 391 U.S. at 397, 88 S.Ct. at 1728.

into the Union on an equal footing with the original States in all respects whatever; and that the constitution which the people of Wyoming have formed for themselves be, and the same is hereby, accepted, ratified and confirmed.

*Race Horse,* 163 U.S. at 506, 16 S.Ct. at 1076–77. "The act contains no exemption or reservation in favor of or for the benefit of Indians." *Id.*

"That 'a treaty may supersede a prior act of Congress, and an act of Congress supersede a prior treaty' is elementary." *Id.* at 511, 16 S.Ct. at 1078 (citations omitted). "Of course the settled rule undoubtedly is that repeals by implication are not favored, and will not be held to exist if there be any other reasonable construction. But in ascertaining whether both statutes can be maintained it is not to be considered that any possible theory, by which both can be enforced, must be adopted, but only that repeal by implication must be held not to have taken place if there be a reasonable construction, by which both laws can coexist consistently with the intention of Congress." *Id.* (citations omitted).

Determining, by the light of these principles, the question whether the provision of the treaty giving the right to hunt on unoccupied lands of the United States in the hunting districts are now embraced within the limits of the State of Wyoming, it becomes plain that the repeal results from the conflict between the treaty and the act admitting that State into the Union. The two facts, the privilege conferred and the act of admission, are irreconcilable in the sense that the two under no reasonable hypothesis can be construed as coexisting.

*Id.* at 514, 16 S.Ct. at 1079–80.

The Court "conceded that where there are rights created by Congress, during the existence of a Territory, which are of such a nature as to imply their perpetuity, and the consequent purpose of Congress to continue them in the State, after its admission, such continuation will, as a matter of construction, be upheld, although the enabling act does not expressly so direct." *Id.* at 515, 16 S.Ct. at 1080. However, "[h]ere the nature of the right created gives rise to no such implication of continuance, since, by its terms, it shows that the burden imposed on the Territory was essentially perishable and intended to be of limited duration." [3] *Id.* Therefore, the treaty "does not give [the Tribe] the right to exercise this privilege within the limits of [Wyoming] in violation of its laws." *Id.* at 504, 16 S.Ct. at 1076.

### 1.

The Tribe contends that in *Hughes v. Oklahoma,* 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979), the Supreme Court overruled the doctrine of state plenary control over game relied on in *Race Horse;* therefore, "[t]here is no irreconcilable conflict between the state power to regulate and the exercise of federal authority as mistakenly supposed in *Race Horse.*" (Brief of Appellants at 21). In support of its position, the Tribe cites a string of cases upholding federal authority to regulate wildlife notwithstanding claims of interference with state sovereignty: *Missouri v. Holland,* 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920); *Hunt v. United States,* 278 U.S. 96, 100, 49 S.Ct. 38, 38, 73 L.Ed. 200 (1928); *Kleppe v. New Mexico,* 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976); and *New Mexico State Game Comm'n v. Udall,* 410 F.2d 1197 (10th Cir.), *cert. denied,* 396 U.S. 961, 90 S.Ct. 429, 24 L.Ed.2d 426 (1969).

In *Hughes,* the Court expressly overruled the doctrine of state ownership of game, concluding that challenges under the Commerce Clause to state regulation of wild animals should be considered according to the same general rule applied to state regulation of other natural resources. 441 U.S. at 322, 99 S.Ct. at 1729. *Hughes* involved an Oklahoma statute that prohibited the transportation or shipping outside the State of natural

---

**3.** In July, 1868, the act which provided for a temporary government for the Territory of Wyoming was passed and provided:

That nothing in this act shall be construed to impair the rights of person or property now pertaining to the Indians in said Territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians.

*Race Horse,* 163 U.S. at 506, 16 S.Ct. at 1076.

minnows seined or procured from waters within the State for sale. *Id.* The Court struck down the statute as facially discriminatory against interstate commerce and "repugnant to the Commerce Clause." *Id.* at 337–38, 99 S.Ct. at 1737. However, in so doing, the Court reiterated that:

> The overruling of *Geer* [*v. Connecticut,* 161 U.S. 519 [16 S.Ct. 600, 40 L.Ed. 793] (1896),] does not leave the States powerless to protect and conserve wild animal life within their borders. Today's decision makes clear, however, that States may promote this legitimate purpose only in ways consistent with the basic principle that 'our economic unit is the Nation,' and that when a wild animal 'becomes an article of commerce its use cannot be limited to the citizens of one State to the exclusion of citizens of another State.'

*Id.* at 338–39, 99 S.Ct. at 1737–38 (internal citations omitted).

■ "Unquestionably the States have broad trustee and police powers over wild animals within their jurisdiction." *Kleppe,* 426 U.S. at 545, 96 S.Ct. at 2294 (citations omitted). "But, as *Geer v. Connecticut* cautions, those powers exist only 'in so far as [their] exercise may be not incompatible with, or restrained by, the rights conveyed to the Federal government by the Constitution.'" *Id.* (citing *Geer,* 161 U.S. at 528, 16 S.Ct. at 604). *See also Baldwin v. Fish and Game Comm'n of Mont.,* 436 U.S. 371, 386, 98 S.Ct. 1852, 1861–62, 56 L.Ed.2d 354 (1978) ("The fact that the State's control over wildlife is not exclusive and absolute in the face of federal regulation and certain federally protected interest does not compel the conclusion that it is meaningless in their absence); *Puyallup I,* 391 U.S. at 399, 88 S.Ct. at 1729 ("The overriding police power of the State, expressed in nondiscriminatory measures for conserving fish resources, is preserved."); *Tulee v. Washington,* 315 U.S. 681, 684, 62 S.Ct. 862, 864, 86 L.Ed. 1115 (1942) (the state has the power to regulate as necessary for the conservation of fish); *Hunt,* 278 U.S. 96, 49 S.Ct. 38 (the power of the federal government to regulate game independent of state game laws springs from the federal ownership of the lands affected pursuant to the Property Clause); *Holland,* 252 U.S. 416, 40 S.Ct. 382 (valid treaty and statute preempt state regulation under the treaty making power conferred by Art. II, § 2 of the Constitution).

■ Therefore, the Court in *Hughes* has not stripped the states of their authority to regulate and control game; it has merely removed the 19th century legal fiction of state ownership of game. *Hughes,* 441 U.S. at 336, 99 S.Ct. at 1736. And absent any conflict between federal and state authority to regulate the taking of game, the state retains the authority, even over federal lands within its borders. *Kleppe,* 426 U.S. at 543, 96 S.Ct. at 2293–94 (citations omitted).

In *Race Horse,* the Court recognized the "power of a State to control and regulate the taking of game." 163 U.S. at 507, 16 S.Ct. at 1077. However, contrary to the Tribe's assertion, the Court did not find a "plenary" power to regulate the taking of game nor did the Court rely on such a power in reaching its decision. The Court stated that:

> Nor need we stop to consider the argument advanced at bar, that as the United States, under the authority delegated to it by the Constitution in relation to Indian tribes, has a right to deal with that subject, therefore it has the power to exempt from the operation of state game laws each particular piece of land, owned by it in private ownership within a State, for nothing in this case shows that this power has been exerted by Congress.

*Id.* at 514, 16 S.Ct. at 1080. Furthermore, the "irreconcilable conflict" in *Race Horse* was between the right conferred by the treaty and the act admitting Wyoming into the Union, not between the state's power to regulate and the exercise of federal authority. 163 U.S. at 514, 16 S.Ct. at 1079–80.

### 2.

The Tribe asserts that a "major premise" of the Court's decision in *Race Horse* was the equal-footing doctrine which has since been overruled and repudiated in the context of off-reservation treaty rights.

■ The equal-footing doctrine requires that all states admitted into the Union after

the original thirteen states be admitted on "equal-footing" with the original states; the newly admitted states must have the same rights and sovereignty at the time of admission as the original states. *California ex rel. State Lands Comm'n v. United States*, 457 U.S. 273, 281 n. 9, 102 S.Ct. 2432, 2437 n. 9, 73 L.Ed.2d 1 (1982) (citing *Pollard v. Hagan*, 44 U.S. (3 How.) 212, 229, 11 L.Ed. 565 (1845), and *Shively v. Bowlby*, 152 U.S. 1, 26 & 30, 14 S.Ct. 548, 557 & 559, 38 L.Ed. 331 (1894)).

In *United States v. Winans*, 198 U.S. 371, 371, 25 S.Ct. 662, 662, 49 L.Ed. 1089 (1905), the Court upheld an Indian treaty right to take "fish at all usual and accustomed places in common with the citizens of the Territory of Washington" concluding that the treaty language imposed a servitude on the lands bordering the Columbia River that was intended to be continuing against the United States and its grantees and the State and its grantees. In *Winans*, the Indians sought access across lands bordering the Columbia River which were privately owned either under patent from the United States or grant from the state of Washington in order to exercise their treaty fishing right. *Id.* at 379, 25 S.Ct. at 663.

In interpreting the treaty language, the Court determined that although the Indians were not given an exclusive right but one "in common with citizens of the Territory," their right was a continuing one. *Id.* at 381–82, 25 S.Ct. at 664–65. The Court concluded that:

> The contingency of the future ownership of the lands, therefore, was foreseen and provided for—in other words, the Indians were given the right in the land—the right of crossing it to the river—the right to occupy it to the extent and for the purpose mentioned. No other conclusion would give effect to the treaty. And the right was intended to be continuing against the United States and its grantees as well as against the State and its grantees.

*Id.*

Once the Court determined that the right to fish was a continuing right, it addressed the state's argument that the equal-footing doctrine prevented the United States from granting or retaining rights in the shore or to the lands under the water. *Id.* at 382–83, 25 S.Ct. at 664–65. The Court held that while the United States held the lands as a Territory, it had the power to create rights which would be binding on the States, *id.* at 383, 25 S.Ct. at 665; therefore, "surely it was within the competency of the Nation to secure to the Indians such a remnant of the great rights they possessed as 'taking fish at all usual and accustomed places.'" *Id.* at 384, 25 S.Ct. at 665.

■ Hence, the equal-footing doctrine does not prevent the United States from creating a right in a territory which would be binding on the state upon its admission into the Union. However, in order for such a right to be binding on the state, it must be a continuing or perpetual right—a right that is intended at its formation to be continuing against the United States and its grantees, including the state. *See Winans*, 198 U.S. at 381–82, 25 S.Ct. at 664–65.

■ In *Race Horse*, the Court was fully aware of Congress's power to create binding continuing rights. 163 U.S. at 515, 16 S.Ct. at 1080. However, the Court concluded that the right conferred by the Treaty with the Crows, 1868, was "temporary and precarious"; it was not a continuing right. *Id.* In addition, the Court found that it was the intent of Congress to repeal the right to hunt upon Wyoming's admission to the Union. *Id.* at 515, 16 S.Ct. at 1080. The Court stated:

> Nor would this case be affected by conceding that Congress, during the existence of the Territory, had full authority in the exercise of its treaty making power to charge the Territory, or the land therein, with such contractual burdens as were deemed best, and that when they were imposed on a Territory it would be also within the power of Congress to continue them in the State, on its admission into the Union. Here the enabling act not only contains no expression of the intention of Congress to continue the burdens in question in the State, but, on the contrary, its intention not to do so is conveyed by the express terms of the act of admission.

.    .    .    .    .

Indeed, the whole argument of the [Indians] rests on the assumption that there was a perpetual right conveyed by the treaty, when in fact the privilege given was temporary and precarious.

*Id.*

### 3.

The Tribe asserts that the Supreme Court has, subsequent to *Race Horse,* fashioned rules of treaty construction favoring Indian tribes that have replaced and repudiated those used in *Race Horse.* The Tribe asserts that *"Race Horse'*s application of rules of treaty construction to resolve the supposed conflict between Wyoming's admission to the Union and the [Treaty with the Crows, 1868,] has been discredited and no longer represents the law;" therefore, *Race Horse* should not be followed. (Brief of Appellants at 30).

In fact, it was in 1832, sixty-four years prior to the Court's decision in *Race Horse,* that the Court determined that:

The language used in treaties with the Indians should never be construed to their prejudice. If words be made use of, which are susceptible of a more extended meaning than their plain import, as connected with the tenor of the treaty, they should be considered as used only in the latter sense.... How the words of the treaty were understood by this unlettered people, rather than their critical meaning, should form the rule of construction.

*Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 582, 8 L.Ed. 483 (1832). *See also In re Kansas Indians,* 72 U.S. (5 Wall.) 737, 760, 18 L.Ed. 667 (1866); *United States v. Kagama,* 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886); *Choctaw Nation v. United States,* 119 U.S. 1, 28, 7 S.Ct. 75, 90–91, 30 L.Ed. 306 (1886). Therefore, contrary to the Tribe's view, the canon of construction favoring the Indian interpretation and resolving ambiguities in favor of the Indians was well established at the time the Court decided *Race Horse* in 1896.

Additionally, the Court recognized this canon of construction in *Race Horse* and declined to follow it. The Court stated that:

Doubtless the rule that treaties should be so construed as to uphold the sanctity of the public faith ought not to be departed from. But that salutary rule should not be made an instrument for violating the public faith by distorting the words of a treaty, in order to imply that it conveyed rights wholly inconsistent with its language and in conflict with an act of Congress, and also destructive of the rights of one of the States.

*Race Horse,* 163 U.S. at 516, 16 S.Ct. at 1080.

### 4. & 5.

The Tribe asserts that the Supreme Court has reconciled state regulatory authority and Indian off-reservation hunting rights which abolishes any conflict between state regulatory power and treaty rights reserved to the Indians and that the State failed to show that conservation measures were required.

■ As noted above, the Court has recognized that states may regulate off-reservation treaty rights "in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians." *Puyallup I,* 391 U.S. at 398, 88 S.Ct. at 1728. In order to be effective, state conservation regulations must be "reasonable and necessary." *Department of Game of Wash. v. Puyallup Tribe,* 414 U.S. 44, 45, 94 S.Ct. 330, 332, 38 L.Ed.2d 254 (1973) (*Puyallup II* ). *See also Puyallup Tribe, Inc. v. Department of Game of Wash.,* 433 U.S. 165, 175, 97 S.Ct. 2616, 2622–23, 53 L.Ed.2d 667 (1977) (*Puyallup III* ) ("Rather, the exercise of that right was subject to reasonable regulation by the State pursuant to its power to conserve an important natural resource."); *Tulee,* 315 U.S. at 684, 62 S.Ct. at 865. ("Washington has the power to impose on the Indians equally with others such restrictions of a purely regulatory nature concerning the time and manner of fishing outside the reservation as are necessary for the conservation of fish.").

■ However, this is not our case. The Tribe's right to hunt reserved in the Treaty with the Crows, 1868, was repealed by the act admitting Wyoming into the Union. *Race Horse,* 163 U.S. at 514, 16 S.Ct. at 1079–80. Therefore, the Tribe and its members are subject to Wyoming's game laws

and regulations regardless of whether the regulations are reasonable and necessary for conservation.

■ In addition, if the Treaty with the Crows, 1868, had reserved a continuing right which had survived Wyoming's admission, we hold there is ample evidence in the record to support the State's contention that its regulations were reasonable and necessary for conservation. *See* (J.A., Vol. I at 197–98, 210–12, 265–66, 271–73).

## C.

■ As an alternative basis for affirmance of the district court's dismissal of the Tribe's action, the State contends that the Tribe has no right to hunt in the Big Horn National Forest in violation of Wyoming's game laws since the treaty reserved an off-reservation hunting right on "unoccupied" lands and the lands of the Big Horn National Forest are "occupied." Although the district court did not reach this issue, it was raised by the State and "we are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." *United States v. Sandoval,* 29 F.3d 537, 542 n. 6 (10th Cir. 1994) (citation omitted).

■ When the Treaty with the Crows, 1868, was executed the lands located in what is now the Big Horn National Forest were unoccupied; they were open for settlement in the westward expansion of the United States. However, in 1887, Congress created the Big Horn National Forest and expressly mandated that the national forest lands be managed and regulated for the specific purposes of improving and protecting the forest, securing favorable water flows, and furnishing a continuous supply of timber.[4] *See* 16 U.S.C. § 475. These lands were no longer available for settlement. No longer could anyone tim-

ber, mine, log, graze cattle, or homestead on these lands without federal permission. *See* Act of June 4, 1897, Ch. 2, 30 Stat. at 35–36 (1897). Thus, the creation of the Big Horn National Forest resulted·in the "occupation" of the land.

## II. Elk Fence

■ The Tribe contends that the district court erred in dismissing its action relating to the elk fence. The Tribe argues that it has standing to bring this action under the UIA and that it may maintain such action against Francis Petera, Director of the Wyoming Game and Fish Commission.[5]

The Wyoming Game and Fish Commission owns and maintains a fence which is approximately six to seven miles long located near the Kerns Big Game Winter Range. The fence impedes the movement of elk onto private property. The United States, through the Department of Interior, agreed that the elk-proof fence should be constructed; provided matching funds for its construction and maintenance; and approved the subsequent management strategies for the elk contained therein. (J.A., Vol. I at 219–242).

Under the UIA, "it shall be the duty of the United States Attorney for the proper district, on affidavit filed with him by any citizen of the United States that section 1061 ... is being violated ... to institute a civil suit in the proper United States district court, or territorial district court, in the name of the United States." 43 U.S.C. § 1062. Thus, the UIA specifically provides for federal enforcement to be brought in the name of the United States; there is no private right of action. *See Camfield v. United States,* 167 U.S. 518, 522, 17 S.Ct. 864, 865–66, 42 L.Ed. 260 (1897) ("it is made the duty of the district attorney ... to institute a civil suit in the name of the United States").

■ The role of a private party is explicitly defined as the filing of an affidavit alerting the United States Attorney for the dis-

---

4. In 1960, Congress passed the Multiple–Use Sustained Yield Act of 1960 which provided that "national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes" as well as the original purposes set forth in 16 U.S.C. § 475. 16 U.S.C. § 528.

5. Although the claim was originally filed against both individual defendants, on appeal the Tribe challenges the district court's decision solely in regards to Francis Petera, Director of the Wyoming Game and Fish Commission. Therefore, their claim against Chuck Repsis, the Director of the Wyoming Department of Game and Fish, has been abandoned. (Brief of Appellants at 35).

trict of potential violations of the UIA. *See* 43 U.S.C. § 1062. Once a case is properly commenced by the United States, it is possible for an interested party, such as the Tribe, to obtain permission to intervene. *See United States ex rel. Bergen v. Lawrence,* 848 F.2d 1502, 1504 (10th Cir.) (Wildlife Federation joined as intervenors in UIA case), *cert. denied,* 488 U.S. 980, 109 S.Ct. 528, 102 L.Ed.2d 560 (1988). However, the private party lacks standing to assert a violation of the UIA on its own.

### Conclusion

We **AFFIRM** the district court's grant of summary judgment in favor of the State and dismissal of the Tribe's UIA claim. Unlike the district court's apologetic interpretation of and reluctant reliance upon *Ward v. Race Horse,* we view *Race Horse* as compelling, well-reasoned, and persuasive.[6] Also, contrary to the Tribe's views, there is nothing to indicate that *Race Horse* has been "overruled, repudiated or disclaimed;" *Race Horse* is alive and well.

*Race Horse* conclusively established that "the right to hunt on all unoccupied lands of the United States so long as game may be found thereon, ..." reserved a temporary right which was repealed with Wyoming's admission into the Union. 163 U.S. at 504, 16 S.Ct. at 1076. In addition, although the Treaty with the Crows, 1868, reserved a right to hunt on "unoccupied lands;" the lands of the Big Horn National Forest have been "occupied" since the creation of the national forest in 1887. Therefore, we hold that the Tribe and its members are subject to the game laws of Wyoming.

Finally, we hold that the Tribe, as a private party, lacks standing to bring a suit under the UIA.

**AFFIRMED.**

---

6. *State v. Tinno,* 94 Idaho 759, 497 P.2d 1386 (1972), which was authoritatively cited by the district court and argued before us by the Tribe, is obvious by its omission from this opinion. In *Tinno,* the Idaho Supreme Court found that *Race Horse* had been "entirely discredited" and "re- quire[d] no further discussion." *Id.* 497 P.2d at 1392 n. 6. However, this conclusion was made with no analysis and in a case where the court acknowledged that it lacked jurisdiction. *Id.* at 1388 ("We are constrained by I.C. § 19–2804 to hold that the appeal must be dismissed.").