Dear Hoskin:
¶ 0 This office has received your request for an official Attorney General Opinion in which you ask, in effect, the following questions:
1. May commercial enterprises located on the KawNation's Indian lands, such as travel plazas, conveniencestores and smoke shops operated by the Kaw Nation EnterpriseDevelopment Authority, an arm of the Kaw Nation, function as lotteryretailers for the Oklahoma Education Lottery Commission in theabsence of a Class III Gaming Compact under the provisions of theIndian Gaming RegulatoryAct, 25 U.S.C. §§ 2701 — 2721 (West, Westlaw through 2011),which permits such gaming?
 2. What is required for Kaw Nation Enterprise DevelopmentAuthority facilities located outside of the Nation's Indianlands to become Oklahoma Education Lottery retailers?
 I. Introduction
¶ 1 As more fully explained below, the answer to your first question greatly depends on how Congress classifies lotteries under the national Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 — 2721 (West, Westlaw through 2011). We thus begin our analysis with a discussion of Congress's classification of gaming in the Indian Gaming Regulatory Act.
 II. A Lottery, Such as the Oklahoma Education Lottery, is Class III Gaming Under the Indian Gaming Regulatory Act.
¶ 2 One of the primary purposes of the Indian Gaming Regulatory Act is "the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands."Id. § 2702(3) (emphasis added).
¶ 3 In regulating gaming on Indian lands the Indian Gaming Regulatory Act divides gaming into three classes.Id. § 2710(a), (d). Two of the classes are regulated by the Indian tribes, either alone or with federal supervision.Id. Class I gaming consists of "social games solely for prizes of minimal value or traditional forms of Indian gaming."Id. § 2703(6). Jurisdiction over Class I gaming lies exclusively with the Indian tribes, and these games are not subject to the provisions of the Indian Gaming Regulatory Act.Id. § 2710(a)(1).
¶ 4 Class II gaming consists of bingo, and, if played in the same location, pull tabs, lotto, punch boards, tip jars, instant bingo and other games similar to bingo. Id. § 2703(7)(A)(i). It also includes certain card games. Id. § 2703(7)(A)(ii). While left within the jurisdiction of the Indian tribes, Class II gaming requires, among other things, federal approval of all tribal ordinances and regulations relating to such gaming.Id. § 2710(b)(1)(B).
¶ 5 Class III gaming consists of all forms of gaming that arenot Class I or Class II gaming. Id. § 2703(8). This class of gaming includes non-grandfathered banking card games, pari-mutuel horse racing, roulette, lottery, casino and any other game not falling within the definition of Class I or Class II gaming.
¶ 6 While Congress made Class I and Class II gaming subject to tribal regulation and jurisdiction, it looked to the states to help regulate Class III gaming, through the use of Tribal-State Gaming Compacts, because of the states' experience in regulating Class III gaming. Id. § 2710(d).
¶ 7 Because lotteries are not included in the Indian Gaming Regulatory Act's definition of either Class I or Class II gaming, lotteries are Class III games under the Indian Gaming Regulatory Act.
 III. Class III Gaming, Such as the Oklahoma Education Lottery, Can be Conducted on a Federally Recognized Indian Tribe's Indian Land Only if a Tribal-State Gaming Compact is in Place, the Compact Permits such Gaming, and the Compact Has Been Approved by the Secretary of the Interior.
¶ 8 It was because of the need for the expertise and experience of state regulators the Indian Gaming Regulatory Act did notprovide for or even contemplate the conduct of Class III gaming inthe absence of a Tribal-State Compact. As Senator Inouye (one of the chief Senate proponents of the Act) stated, "The Actdoes not contemplate and does not provide for the conduct ofClass III gaming activities on Indian land in the absenceof a Tribal-State Compact." 134 Cong. Rec. S12650 (daily ed. Sept. 15, 1988) (statement of Sen. Inouye) (emphasis added). Noting this, Senator Inouye further stated that tribes that choose to engage in Class III gaming may do so only if a compact is in place:
 Under this provision, tribes that choose to engage in gaming may only do so if they work out a tribal-state compact with the State. Tribes that do not want any State jurisdiction on their lands are precluded from operation of what the bill refers to as class III gaming.
Id. (emphasis added).
¶ 9 In providing for Class III gaming on Indian lands the Indian Gaming Regulatory Act at 25 U.S.C. § 2710(d), established the conditions necessary for such gaming, one of which, is that such gaming be conducted in conformity with the Tribal-State Compact entered into by the Indian tribe and the State:
 (1) Class III gaming activities shall be lawful on Indian lands only if such activities are —
 (A) authorized by an ordinance or resolution that —
 (i) is adopted by the governing body of the Indian tribe having jurisdiction over such lands,
 (ii) meets the requirements of subsection (b) of this section, and
 (iii) is approved by the Chairman,
 (B) located in a State that permits such gaming for any purpose by any person, organization, or entity, and
 (C) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect.
Id. (emphasis added).
¶ 10 Under this provision, Class III gaming — such as the Oklahoma Education Lottery — can be lawfully conducted within the Kaw Nation's Indian lands only if the Kaw Nation and the State have entered into a Tribal-State Gaming Compact that permits the tribe to conduct or take part in lotteries. A Tribal-State Gaming Compact takes effect "only when notice of approval by the Secretary [of the Interior] of such compact has been published by the Secretary in the Federal Register."Id. § 2710(d)(3)(B).
¶ 11 Class III gaming compacts deal only with gaming on Indian lands. The term "Indian lands" is defined in the Indian Gaming Regulatory Act, at Section 2703 as follows:
 (4) The term "Indian lands" means —
 (A) all lands within the limits of any Indian reservation; and
 (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.
¶ 12 In sum, because the Oklahoma Education Lottery is Class III gaming, it can only be conducted on Kaw Nation Indian land if a Tribal-State Compact permitting such gaming is in place, and the Compact has been approved by the Secretary of Interior, as the Indian Gaming Regulatory Act requires.
 IV. The Kaw Nation Has Entered Into the Model Tribal Gaming Compact Set Forth at 3A O.S.Supp. 2010, § 281[3A-281], and Underthat Model Compact, the Oklahoma Education Lottery May be Conducted on Kaw Nation Indian Lands, But Only if the Secretary of the Interior Approves the Use of Lotteries at a Later Date.
¶ 13 The Oklahoma Legislature at 3A O.S.Supp. 2010, § 280[3A-280], made an offer of a Model Tribal Gaming Compact to all federally recognized Indian tribes within the State of Oklahoma that own or are beneficial owners of Indian lands as defined by the Indian Regulatory Gaming Act, over which the tribe has jurisdiction as recognized by the Secretary of the Interior. The Legislature's offer to enter into a Model Tribal Gaming Compact provided how tribes could accept the offer. As evidenced by publication in the Federal Register a Compact with the Kaw Nation was, as required, considered approved by the Secretary of the Interior. Indian Gaming,70 Fed. Reg. 12,230 (Mar. 11, 2005).
¶ 14 The Model Gaming Compact, at Part 4, provided that "[t]he tribe and state agree that the tribe is authorized to operate covered games only in accordance with this Compact." 3A O.S.Supp. 2010, § 281[3A-281], pt. 4(A). The term "covered game" is defined in the Model Tribal Gaming Compact as follows:
 "Covered game" means the following games conducted in accordance with the standards, as applicable, set forth in Sections 11 through 18 of the State-Tribal Gaming Act: an electronic bonanza-style bingo game, an electronic amusement game, an electronic instant bingo game, nonhouse-banked card games; any other game, if the operation of such game by a tribe would require a compact and if such game has been: (i) approved by the Oklahoma Horse Racing Commission for use by an organizational licensee, (ii) approved by state legislation for use by any person or entity, or (iii) approved by amendment of the State-Tribal Gaming Act; and upon election by the tribe by written supplement to this Compact, any Class II game in use by the tribe, provided that no exclusivity payments shall be required for the operation of such Class II game[.]
Id. § 281, pt. 3(5) (emphasis added).
¶ 15 As your question recognizes, the Oklahoma Legislature has approved the Oklahoma Education Lottery in the Oklahoma Education Lottery Act, 3A O.S.Supp. 2010, §§ 701[3A-701] — 735. This being so, the Oklahoma Education Lottery falls within the "any other game" portion of the Model Tribal Gaming Compact's definition of "covered game." It would thus appear that the Model Tribal Gaming Compact permits the Oklahoma Education Lottery to be conducted on the Kaw Nation's Indian lands. This, however, is not the case.
¶ 16 The reason that the Oklahoma Legislature's legalization of the Oklahoma Education Lottery, coupled with the Model Tribal Gaming Compact's broad definition of "covered game" does not permit the Oklahoma Education Lottery to be conducted on Kaw Nation Indian land was explained during the Department of the Interior's review of the Tribal Gaming Compact between the Kaw Nation and the State of Oklahoma. The Department of the Interior's January 6, 2006, Compact Review Letter specifically discussed the Model Tribal Gaming Compact's definition of "covered game," concluding that the addition of any game under the "other games" portion of the definition, would require further approval by the Secretary of the Interior:
 Part 3(5) provides that the definition of "covered game" includes "any other game, if the operation of such game by a tribe would require a compact and if such game has been: (i) approved by the Oklahoma Horse Racing Commission for use by an organizational licensee, (ii) approved by state legislation for use by any person or entity, or (iii) approved by amendment of the State-Tribal Gaming Act. Although the Compact does not indicate whether the addition [of] any other class III games under this provision would require review and approval of the Secretary of the Interior under the IGRA, it is our position that such Secretarial approval is required because the inclusion of additional class III games is a substantial modification of the terms of the Compact. It is our view that a substantive modification is one that potentially implicates any of the three statutory reasons available to the Secretary to disapprove a compact in the first instance, i.e., whether the provision violates the IGRA, any other applicable provision of federal law, or the trust obligation of the United States to Indians. See 25 U.S.C. § 2710(d)(8)(B).
Letter from George T. Skibine, the Acting Deputy Assistant Sec'y, Policy Econ. Dev. Dep't of the Interior to Brad Henry, Governor of Okla., at 3 (Jan. 19, 2006), (on file with author)available at
http://www.nigc.gov/Portals/0/NIGC%20Uploads/ readingroom/compacts/Kaw%20Nation%20of %20Oklahoma/kawnationcomp01606.pdf.[1]
¶ 17 We thus conclude that in order for the State of Oklahoma Education Lottery to be conducted on Kaw Nation Indianland, the Kaw Nation would have to submit to the Secretary of the Interior, for review and approval, its intent to have some of its Enterprise Development Authority facilities act as Oklahoma Education Lottery retailers under Oklahoma law and regulations on the Kaw Nation's Indian land, and the Secretary's approval or considered approval, would have to be published in the Federal Register. After such approval, the ability of the Kaw Nation or its businesses to function as retailers for the Oklahoma Education Lottery would require the same contracts and waivers as those required for off-Indian land operations, which are discussed below.
 V. On Land Outside of the Kaw Nation IndianLands, Travel Plazas, Convenience Stores and Smoke Shops Operated by the Kaw Nation Enterprise Development Authority Could BecomeOklahoma Education Lottery Retailers in the Absence of a Compact or Secretary of the Interior Approval, if: 1. They Did so in Accordance with a Contract Entered Into With the Oklahoma Lottery Commission, and
 2. Both the Tribe and the Development Authority Waived Their Sovereign Immunity to Allow the State to Enforce its Contract and Lottery Law in State Court.
¶ 18 You next ask about the requirements for Kaw Nation Enterprise Development Authority businesses, located outside the KawNation's Indian lands, to become Oklahoma Education Lottery retailers.
¶ 19 As discussed above, the Indian Gaming Regulatory Act was established for the purpose of regulating gambling on a tribe'sIndian land, and the conduct of Class III gaming can be conducted on a tribe's Indian land only pursuant to a Tribal-State Gaming Compact. The Indian Gaming Regulatory Act's provisions and restrictions, however, do not apply to gaming activities outside a nation's Indian lands. Accordingly, the Kaw Nation Enterprise Development Authority could, outside of the KawNation's Indian lands, become a retailer for the Oklahoma Education Lottery Commission in the absence of a Class III Compact permitting the Authority to do so.
¶ 20 The Kaw Nation's Enterprise Development Authority's actionoutside the Nation's Indian land would be subject to statelaw. The United States Supreme Court has generally recognized that state regulations may be applied to tribes both on and off reservations. The application of state law to tribal activities on reservations was discussed in Mescalero Apache Tribe v.Jones, 411 U.S. 145 (1973). Mescalero rejected at the outset — as did the state court — the broad assertion that "the Federal Government has exclusive jurisdiction over the Tribe for all purposes and that the State is therefore prohibited from enforcing its revenue laws against any tribal enterprise `(w)hether the enterprise is located on or off tribal land.'"Id. at 147-48. After discussing the application of state law on a reservation, Mescalero discussed the more extensive authority of states over Indian activities beyond the reservation. The Supreme Court stated:
 "State authority over Indians is yet more extensive over activities . . . not on any reservation." Organized Village of Kake, 369 U.S. [60] at 75, 82 S.Ct., at 571. Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State. See, e.g., Puyallup Tribe v. Department of Game, 391 U.S. 392, 398, 88 S.Ct. 1725, 1728, 20 L.Ed.2d 689 (1968); Organized Village of Kake, supra, 369 U.S., at 75-76, 82 S.Ct., at 570-571; Tulee v. Washington, 315 U.S. 681, 683, 62 S.Ct. 862, 863, 86 L.Ed. 1115 (1942); Shaw v. Gibson-Zahniser Oil Corp., 276 U.S. 575, 48 S.Ct. 333, 72 L.Ed. 709 (1928); Ward v. Race Horse, 163 U.S. 504, 16 S.Ct. 1076, 41 L.Ed. 244 (1896).
Id. 148-49 (emphasis added).
¶ 21 While tribes and tribal entities operating outside of Indian Country are generally subject to state law and regulation, tribal entities — even with respect to activities outside of Indian Country — still enjoy sovereign immunity, which protects the tribe and tribal entities from unconsented suit. See NativeAm. Distrib. v. Seneca-Cayuga Tobacco Co.,546 F.3d 1288, 1292 (10th Cir. 2008). The sovereign immunity possessed by federally-recognized Indian tribes is extensive:
 A tribe's sovereign immunity protects its governmental actions.
 A tribe's sovereign immunity protects its commercial activities
 A tribe's sovereign immunity protects its on-reservation (on Indian Country) activities.
 A tribe's sovereign immunity protects its off-reservation activities.
 A tribe's sovereign immunity extends to subdivisions of the tribe.
See id.
¶ 22 The United States Supreme Court in Kiowa Tribe v.Manufacturing Technologies, Inc., 523 U.S. 751, 755 (1998), held that the application of substantive state laws to tribal conduct occurring outside the reservation was not the same as saying "that a tribe no longer enjoys immunity from suit." Id. In other words, "[t]here is a difference between the right to demand compliance with state laws and the means available to enforce them." Id.
¶ 23 The only lottery permitted under Oklahoma law is the Oklahoma Education Lottery. This being the case, the Kaw Nation's Enterprise Development Authority could not — outside of its Indian land — conduct a lottery other than the Oklahoma Education Lottery. Under the Oklahoma Education Lottery Act, the Oklahoma Lottery ("Commission") is required to "develop and maintain a statewide network of lottery retailers that will serve the public convenience and promote the sale of [lottery] tickets." 3A O.S.Supp. 2010, § 717[3A-717](A). Under that same Section, the Commission is required to develop a list of objective criteria upon which the qualification of lottery retailers shall be based and issues certificates of authority to each person with whom itcontracts as a retailer . Id. § 717(E). Further, theCommission has the power to suspend, revoke or terminate theretailer. Id. § 717(E)(2)(4).
¶ 24 Oklahoma Education Lottery retailer contracts are not transferrable. Id. § 718. "All proceeds from the sale of the lottery tickets or shares shall constitute a trust fund until paid to the Oklahoma Lottery Commission," and all "proceeds due to the Commission shall be considered state funds."Id. § 721. Further, under Section 725(C) the Commission is required to; conduct background and credit investigations of potential retailers, supervise ticket or share validation, and inspect retail establishments at times determined solely by the Commission to determine the integrity of the product of the vendor or its operation.
¶ 25 In short, in order to be able to sell Oklahoma Education Lottery tickets or shares, a person or entity must pass a background check, meet established criteria and enter into a contract with the Commission that subjects the retailer to the Commission's jurisdiction and powers. In requiring contracts between the Commission and Oklahoma Education Lottery retailers, the intention of the Legislature was that the contracts be enforceable. Contracts with entities that enjoy sovereign immunity such as Indian tribes, however, are not enforceable unless the protected entity waives its sovereign immunity. Thus, in order for a Kaw Nation Enterprise Development Authority business to become a retailer for the Oklahoma Education Lottery, it must not only enter into a contractual relationship with the Commission, it, the Authority and Nation, must also make themselves amenable to the Commission's enforcement of its contracts and state law, in state court, by waiving their sovereign immunity.
¶ 26 There is nothing in either the Compact or the Oklahoma Education Lottery Act that compels the Commission to enter into retailer contracts with the Kaw Nation or any of its businesses. Accordingly, any contract between the Commission and the Kaw Nation, or any of its businesses would be voluntary, and to be an enforceable contract the Kaw Nation and its businesses would have to waive their sovereign immunity.
¶ 27 Because tribes and tribal entities generally enjoy sovereign immunity from suit as well as enforcement by state agencies, in order for the Kaw Nation Enterprise Development Authority to conduct Oklahoma Education Lottery retail business on its off-Indianland sites, it would not only have to be approved and enter into a retailer contract with the Commission, but also both the tribe and the Kaw Nation Enterprise Development Authority would have to waive immunity, so that the contract with the Commission could be enforced in state court, and so that the Commission's regulations and Lottery laws could be enforced in state court. Similar contracts and waivers would also be required if, under approval by the Secretary of the Interior, the Kaw Nation Development Authority wished to be Oklahoma Education Lottery retailers on Kaw Nation Indian land.
¶ 28 It is, therefore, the official Opinion of the AttorneyGeneral that:
 1. Under the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 — 2721 (West, Westlaw through 2011), Congress divided gaming on Indian lands into three classes. Class III gaming includes, among other forms of gaming, pari-mutual horse racing, roulette, non-grandfathered banking card games, class III casino machines, and lotteries, such as the Oklahoma Education Lottery.
 2. Class III gaming, such as the Oklahoma Education Lottery, under 25 U.S.C. § 2710(d), may be conducted on a Federally recognized Indian tribe's Indian lands only if done in accordance with a Tribal-State Compact, which permits such gaming and the Compact has been approved by the United States Secretary of the Interior as evidenced by the publication of the Secretary's approval in the Federal Register. Indian Gaming, 70 Fed. Reg. 12,230 (Mar. 11, 2005).
 3. The Kaw Nation and the State of Oklahoma have entered into a Tribal-State Gaming Compact that has been approved by the Secretary of the Interior. See id. That Compact, the Model Gaming Compact set forth at 3A O.S.Supp. 2010, § 281[3A-281], pt. 4, provides that the Tribe and State agree that the Tribe is authorized to conduct covered games only in accordance with the Compact.
 4. The Model Gaming Compact's definition of "covered game," in addition to specifically enumerated games (that does not include lotteries), includes the ability of the Nation to conduct "any other game, if operation of such game by a tribe would require a compact [Class III gaming] and if such game has been . . . approved by state legislation for use by any person or entity." Id. § 281, pt. 3(5). The Legislature's authorization of the Oklahoma Education Lottery brings the Oklahoma Education Lottery within the definition of "covered game" under the "any other game" portion of the definition.
 5. In reviewing the Compact for approval, the Acting Deputy Assistant Secretary, in addressing the "any other game" portion of the Compact's definition of "covered game," noted:
 Although the Compact does not indicate whether the addition [of] any other class III game under this provision would require a review and approval by the Secretary of the Interior under the IGRA, it is our position that such Secretary approval is required because the inclusion of additional class III games is a substantial modification of the terms of the Compact.[2]
 6. In accordance with the Department of Interior's letter, in order for the Kaw Nation to conduct or participate in the Oklahoma Education Lottery on the Nation's Indian land, under the "any other game" portion of the Compact's definition of "covered game," the Nation would have to seek and obtain additional approval of the Secretary of the Interior. See id.
 7. Under the provisions of 3A O.S.Supp. 2010, § 717[3A-717], participation as a retailer for the Oklahoma Education Lottery requires a contractual relationship between the retailer and the Oklahoma Lottery Commission. Accordingly, for a Kaw Nation's Enterprise Development Authority facility to be an Oklahoma Education Lottery retailer the Authority would have to enter into the required contractual relationship with the Oklahoma Lottery Commission. Nothing in the Compact or the Oklahoma Education Lottery Act requires that the Oklahoma Lottery Commission enter into retailer contracts with the Kaw Nation or its businesses, thus, any contractual relationship would be a voluntary relationship. The Authority and the Nation would also have to waive sovereign immunity in order for the Oklahoma Lottery Commission to enforce its contract and lottery laws and regulations in Oklahoma State courts and administrative tribunals.
 8. Travel plazas, convenience stores and smoke shops operated by the Kaw Nation's Enterprise Development Authority could become Oklahoma Education Lottery retailers and operate on land outside of the Kaw Nation's Indian lands without a Compact or Secretary of the Interior approval, if:
 A. They do so in accordance with a contract entered into with the Oklahoma Lottery Commission, and
 B. Both the Kaw Nation and applicable entities waive sovereign immunity to allow the State to enforce the contract and lottery laws and regulations in Oklahoma State courts and administrative tribunals.
E. SCOTT PRUITT Attorney General of Oklahoma
NEAL LEADER Senior Assistant Attorney General
[1] This pdf document is a letter addressed to Chairman Guy Munroe, Kaw Nation. On page 4 it states this is an identical letter that went to Governor Brad Henry.
[2] Letter from George T. Skibine, the Acting Deputy Assistant Sec'y, Policy Econ. Dev. Dep't of the Interior to Brad Henry, Governor of Okla., at 3 (Jan. 19, 2006) (on file with author) available at http://www.nigc.gov/Portals/0/NIGC%20Uploads/ readingroom/compacts/Kaw%20Nation%20of%20Oklahoma/ kawnationcomp01606.pdf. *Page 1